ADVOCAT, INC.; Diversicare Leasing Corporation, d/b/a Rich Mountain Nursing and Rehabilitation Center; and Diversicare Management Services Co. *v.* Lon C. SAUER, Individually, and as Administrator of the Estate of Margaretha Sauer, Deceased, and on Behalf of the Wrongful-Death Beneficiaries of Margaretha Sauer

02-189 111 S.W.3d 346

Supreme Court of Arkansas
Opinion delivered May 1, 2003

34

*Dover Dixon Horne P.L.L.C.*, by: *Darrell D. Dover*, and *Williams & Anderson LLP*, by: *Philip S. Anderson, Peter G. Kumpe*, and *Jess Askew III*, for appellants.

*Barrett & Deacon*, by: *D.P. Marshall Jr.* and *Leigh M. Chiles*, for *amicus curiae* American Health Care Association in support of appellants.

*Friday, Eldredge & Clark, LLP*, by: *Kevin A. Crass*, for *amicus curiae* Associated Industries of Arkansas, Inc., and Arkansas State Chamber of Commerce in support of appellants.

*Wilkes & McHugh, P.A.* (Arkansas), by: *Brian D. Reddick, Susan N. Childers*, and *Christine C. Althoff; Wilkes & McHugh, P.A.* (Florida), by: *Bennie Lazzara, Jr.; Page, Thrailkill & McDaniel*, by: *Daniel B. Thrailkill* and *Patrick C. McDaniel*; and *Quattlebaum, Grooms, Tull & Burrow PLLC*, by: *Leon Holmes* and *E.B. Chiles IV*, for appellee Lon C. Sauer.

*Eubanks, Welch, Baker & Schulze*, by: *Morgan E. Welch*; and *Center for Medicare Advocacy, Inc.*, by: *Toby S. Edelman*, for *amicus curiae* National Citizens' Coalition for Nursing Home Reform in support of appellee.

ROBERT L. BROWN, Justice. Appellants Advocat, Inc.; Diversicare Leasing Corporation, d/b/a Rich Mountain Nursing and Rehabilitation Center (Rich Mountain); and Diversicare Management Services Co. appeal various aspects of a total judgment amount of $78,425,000 in favor of appellee Lon C. Sauer, individually, and as Administrator of the Estate of Margaretha Sauer and on behalf of the wrongful-death beneficiaries of Margaretha Sauer (Sauer Estate). Advocat raises multiple points on appeal: (1) the compensatory and punitive damages are grossly excessive and were motivated by passion and prejudice; (2) the punitive-damages verdicts should be reversed due to insufficient evidence, violation of federal constitutional standards, and excessiveness under Arkansas law; (3) the trial court erred in not excluding surveys from the State's Office of Long Term Care; (4) there was insufficient evidence of liability against Advocat and Diversicare Management to support a finding of negligence or medical malpractice; (5) the verdict forms erroneously permitted the jury to duplicate damages; and (6) the trial court erred in submitting inherently erroneous, binding instructions to the jury. We hold that the circuit court abused its discretion in failing to grant a new trial on excessive damages or, alternatively, to order a remittitur. We affirm the judgment on condition of remittitur.

*Facts*

On July 19, 1998, Margaretha Sauer died at the Mena Medical Center following a five-and-one-half year stay at Rich Mountain. She was ninety-three years old. Mrs. Sauer's discharge summary revealed that the cause of her death was severe electrolyte abnormalities, with contributing factors of "Alzheimer's type, dementia[,]" and protein calorie malnutrition.

The events leading up to Mrs. Sauer's death are these. She had been scheduled for the insertion of a gastro-intestinal feeding tube into her stomach on July 6, 1998, but the surgery was delayed due to the doctor's unavailability. On July 18, 1998, at 8:00 a.m., a nursing note reveals that Mrs. Sauer refused her medication. Her vital signs then began to decline. On July 19, 1998, at 3:30 a.m., her vital signs were still declining, and, according to the nursing staff, she was not "acting right." At 5:00 a.m. that same

morning, the nursing staff reported the developments to Dr. David Brown, her treating physician, who ordered that she be taken to the emergency room at the Mena Medical Center. She arrived at the hospital in a semi-comatose condition. She died about sixteen hours later on that same date.

Mrs. Sauer's physical condition at time of death was gleaned from nursing notes. She had lost fifteen pounds in the last month and was in need of a feeding tube. There were signs of bedsores on her body, stemming from lying in urine and excrement. She suffered from contractures from Alzheimer's Disease, which involved contraction of her limbs into her sockets. She also had a urinary infection and had been experiencing a foul vaginal discharge.

On January 12, 2000, the Sauer Estate filed a complaint against the appellants, and included as well Diversicare Corporation of America—Arkansas, and Diversicare Corporation of America as parties defendant.[1] According to the complaint, Advocat was a Pennsylvania corporation and the parent company. Advocat owned eighty-six facilities in the southeast and Canada, sixty-four of which were nursing homes. Diversicare Leasing Corporation was an Arkansas corporation that did business as Rich Mountain Nursing and Rehabilitation Center. Diversicare Management Services Co. was a Tennessee corporation that held the permit for Rich Mountain to operate in the state. The complaint alleged several counts against the named defendants, including negligence, negligence *per se*, tort of outrage, breach of contract, and wrongful death. The complaint prayed for damages for medical expenses and costs, mental anguish, funeral expenses, and for Mrs. Sauer's pain and suffering prior to her death, as well as general and special damages, the costs of litigation, and punitive damages. A first amended complaint filed later dropped the negligence *per se* count and added a new count for medical malpractice.

The appellants generally denied the complaint and asserted affirmative defenses, including failure to allege facts sufficient to state a claim, failure to comply with Ark. R. Civ. P. 9(b) relating

---

[1] Diversicare Corporation of America—Arkansas and Diversicare Corporation of America were voluntarily dismissed from the litigation by the Sauer Estate.

to allegations of fraud, negligence of others, pre-existing condition, failure to mitigate, entitlement to set-off from any recovery, no proximate causation, and statute of limitations, among others. On June 13, 2001, the trial began and lasted eight days. Twenty-eight witnesses testified, and there were twenty-four binders of exhibits. At the trial's conclusion, the jury retired to consider four counts: ordinary negligence, medical malpractice, breach of contract, and wrongful death. The jury returned a verdict for the Sauer Estate on all counts submitted. It awarded compensatory damages of $5 million for ordinary negligence, $10 million for medical malpractice, $25,000 for breach of contract, and $100,000 for each of the surviving beneficiaries for wrongful death. The total judgment against the three appellants for compensatory damages was $15,400,000, with joint and several liability. An award of $25,000 was also entered separately against Diversicare Leasing Corporation for breach of contract. Punitive damages in the amount of $21 million were awarded separately against each of the three appellants, without joint and several liability, for a total punitive damage award of $63 million. Combined judgments totalling $78,425,000 were memorialized by order of the court.

On July 9, 2001, the appellants filed their motion for judgment notwithstanding the verdict and remittitur, or, in the alternative, for a new trial. A hearing was held on the motion, and on August 3, 2001, the circuit court issued a letter opinion in which it denied the motion. The court said that it was "unable to state that the evidence produced during this 9 day trial was insubstantial and that the jury's decision should be set aside." The court further wrote:

> With respect to the Defendant's contentions in its Motion for JNOV or in the alternative a new trial, these have been previously ruled upon and I am convinced that those rulings should stand. As I mentioned at the conclusion of the hearing on the Defendant's present motion, the jury was presented with evidence that these three companies were operated as one company. Dep. of Mary Margaret Hamlett at p. 23.

The court concluded:

> While the Court may very well believe that the amount of the verdicts both compensatory and punitive may be excessive, it has

> no authority to impose its belief over the decision of the jury. . . .
> However, a belief by a trial court that damages are excessive is
> not, standing alone, a sufficient ground for ordering a reduction
> because if that were the standard, the great discretion of the jury
> would be abrogated.

The court termed the verdict "very large" but said it was "at a loss as to how I can substitute my opinion for that of the jury. Obviously the jury must have concluded that Mrs. Sauer suffered from pain and suffering." As a final point, the court reiterated: "While I feel the verdict is extremely large, I just do not think I can enter a substitute of my belief for that of the jury in this case."

Regarding remittitur, the court ruled that *de novo* review was not its standard of review but was for the appellate court. The court further found that while the financial information of the appellant corporations would have been helpful in deciding whether the award for punitive damages should stand or be reduced, the appellants had the opportunity to submit the same information to the jury and chose not to do so. The court also discussed the criteria set out by the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), relating to whether the size of the punitive-damage award violated the appellants' right to due process, but deferred to the jury and found no violation of the appellants' due process rights. On the same day as the letter opinion, an order was entered denying appellants' motion for judgment notwithstanding the verdict, remittitur, and new trial.

## I. Excessive Compensatory Damages

The appellants first argue that the damage awards for negligence and medical malpractice are grossly excessive. In support of their position, the appellants assert that the only elements of damage at issue were past medical expenses, conscious pain and suffering, scars and disfigurement, and contract damages. Moreover, they maintain that Mrs. Sauer had no dependents, was unemployed, and had a life expectancy of two years at the time of her death. She had been at Rich Mountain for five and one-half years but was now crippled by Alzheimer's disease and bed-bound.

With respect to pain and suffering, they contend that evidence of such is scarce in the record. They further maintain that the introduction of two Office of Long Term Care surveys, admitted over their objection, inflamed the jury, because the surveys were "replete with statements that there was not enough help in the nursing home to feed, bathe, or clean residents." Additionally, appellants submit that testimony by witnesses that the nursing home had engaged in "false-charting" to show more staff than were actually present was prejudicial, because it suggested the appellants had staffing inadequacies that they tried to conceal from the State.

The appellants also point to the prejudicial testimony of Faye Chamberlain, a former nurse assistant at the home, who wrote to then-President Clinton in 1997 about the nursing home's inadequacies, and the testimony of Mark Hemingway, a former regional vice-president of Diversicare Management, who testified to a change in corporate philosophy in 1996 to stressing profits over care. There was, too, they assert, the prejudicial testimony of a former chief financial officer, Mary Margaret Hamlett, who testified that all three separate appellants were run as one company. The appellants conclude that all of this testimony combined incited the jury to give the largest personal-injury verdict ever awarded in Arkansas and inflamed the jury, not because of Mrs. Sauer's injuries, but because of problems in the nursing home industry as a whole. They add that there was no basis for the jury's award of $5 million for negligence or $10 million for medical malpractice, when Mrs. Sauer's actual medical bills totaled little more than $7,700. Indeed, they contend that in a recent case this court reversed an award of $100,000 for pain and suffering to the estate of an sixty-six-year-old woman who died after waiting thirteen hours for a consultation with a surgeon. See *Williamson v. Elrod*, 348 Ark. 307, 72 S.W.3d 489 (2002).

The appellants further assert that the Sauer Estate is urging the wrong standard of review and that the correct standard is *de novo* review. They contend that the jury awarded the appellee $14,992,291.50 (total compensatory damages less actual medical damages) for pain and suffering associated with pressure sores, contractures, oral hygiene, and lack of food or drink that occurred only during the last 24 to 48 hours of Mrs. Sauer's life. They

claim that the Sauer Estate grossly exaggerated the number and severity of Mrs. Sauer's pressure sores and that her contractures and poor oral hygiene do not support such an award for pain and suffering; nor, they urge, was there evidence that Mrs. Sauer's vaginal discharge caused her any pain and suffering. As for her lack of food and water, the appellants contend that had the family permitted a feeding tube earlier, she would have lived.

■ ■ We, initially, are of the opinion that the Sauer Estate correctly states our standard of review. Where an award of damages is alleged to be excessive, this court reviews the proof and all reasonable inferences most favorably to the appellee and determines whether the verdict is so great as to shock the conscience of the court or demonstrate passion or prejudice on the part of the trier of fact. *See Houston v. Knoedl*, 329 Ark. 91, 947 S.W.2d 745 (1997). Remittitur is appropriate when the compensatory damages awarded are excessive and cannot be sustained by the evidence. *See Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999). The standard of review in such a case is that appropriate for a new trial motion, *i.e.*, whether there is substantial evidence to support the verdict. *See Johnson v. Gilliland*, 320 Ark. 1, 896 S.W.2d 856 (1995) (citing Ark. R. Civ. P. 59(a)(5) (stating a new trial may be granted on the ground that there was error in the assessment of the amount of recovery, whether too large or too small)). Moreover, Arkansas Rule of Civil Procedure 59(a)(4) provides as one ground for a new trial "excessive damages appearing to have been given under the influence of passion or prejudice."

Here, Mrs. Sauer died in the care of Rich Mountain from severe malnutrition and dehydration. There was evidence presented that she was found at times with dried feces under her fingernails from scratching herself while lying in her own excrement. At other times, she was not "gotten up" out of her bed as she should have been. Often times, Mrs. Sauer's food tray was found in her room, untouched because there was no staff member at the nursing home available to feed her. She was not provided with "range of motion" assistance when the facility was short of staff. On one occasion, her son complained to staff that he had found his mother at 3:00 p.m., still in her gown, wet with urine, disturbed, and upset.

Testimony further revealed that at times, there was not enough hot water with which patients could shower. Mrs. Sauer was often times found wet without being changed in four hours. She had pressure sores on her back, lower buttock, and arms on days she was found sitting in urine and excrement. A former staff member remembered seeing Mrs. Sauer at one time with a pressure sore the size of a softball, which was open. Her sores and blisters became infected. She was frequently double-padded, and even triple-padded, rather than single-padded for her incontinence problems. At times, she had no water pitcher in her room; nor did she receive a bath for a week or longer, due to there not being enough staff at the facility. She was described as "always thirsty" and her nursing notes indicated that she was heard moaning and crying. At the time she was hospitalized prior to her death, she had a severe vaginal infection. When she was in the geriatric chair, she was not "let loose" every two hours, as required by law. Finally, Mrs. Sauer was found to suffer from poor oral hygiene with caked food and debris in her mouth.

■ We hold that the jury verdicts were not based on passion or prejudice. There was ample testimony and evidence presented to demonstrate that Mrs. Sauer suffered considerably and was not properly cared for, that Rich Mountain was short-staffed, and that the appellants tried to cover this up by "false-charting" and by bringing in additional "employees" on state-inspection days. Mr. Hemingway testified that these deficiencies were due to a shift in corporate philosophy that placed profits over proper patient care. All of this serves to support the Sauer Estate's case that the nursing home, under the auspices of the appellants, knew it had staffing problems and committed negligence as to Mrs. Sauer, because it was short-staffed due to cutbacks.

■ ■ The second question for this court to resolve is whether the verdict for compensatory damages was so great as to shock the conscience of the court.[2] This court has held that there is no definite and satisfactory rule to measure compensation for

---

[2] The appellants note in their reply brief that they do not take issue with the jury's award of $25,000 awarded for breach of contract and $100,000 awarded to each of Mrs. Sauer's four sons for her wrongful death. Accordingly, there is no need for this court to address those verdicts.

pain and suffering; the amount of damages must depend on the circumstances of each particular case. *See McElroy v. Benefield,* 299 Ark. 112, 771 S.W.2d 274 (1989). Additionally, we have held that compensation for pain and suffering must be left to the sound discretion of the jury and the conclusion reached by it should not be disturbed unless the award is clearly excessive. *See id.* In this regard, we have observed that where the jury's award is not segmented, it is difficult for this court to surmise what the basis for the jury award was, apart from medical expenses. *See West Union v. Vostatek,* 302 Ark. 219, 788 S.W.2d 952 (1990).

The evidence in this case certainly reflects that Mrs. Sauer's estate was entitled to damages for pain and suffering in connection with both negligence and medical malpractice. The question is, in what amount?

At the posttrial hearing on excessive damages, the appellants argued that the compensatory damages award should be reduced to $50,000 in accordance with newly-enacted Act 1621 of 2001, which establishes the public policy of this state. The amended code section now provides:

(a)(1) The State of Arkansas and the Attorney General may institute a civil action against any long-term care facility caregiver necessary to enforce any provision of this chapter.

(2) Notwithstanding any criminal penalties assessed under this chapter, any caregiver against whom any civil judgment is entered as the result of a civil action brought by the State of Arkansas through the Attorney General on a complaint alleging that caregiver to have abused, neglected, or exploited an endangered or impaired adult in a long-term care facility required to be licensed under § 20-10-224 shall be subject to pay a civil penalty:

(A) Not to exceed ten thousand dollars ($10,000) for each violation judicially found to have occurred; or

(B) Not to exceed fifty thousand dollars ($50,000) for the death of an adult in a long-term care facility which results from a single violation.

(3)(A) The State of Arkansas and the Attorney General shall not be precluded from recovering civil penalties under subdivision (a)(2)(A) of this section for the death of an adult which results from multiple violations.

(B) However, the State of Arkansas and the Attorney General shall be prohibited from recovering civil penalties under both subdivisions (a)(2)(A) and (B) of this section.

(b) In any action brought pursuant to this section, the State of Arkansas shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.

(c) Any penalty shall be paid into the Treasury of the State of Arkansas and credited to the Arkansas Medicaid Program Trust Fund.

(d) Any caregiver against whom any civil judgment is entered as the result of a civil action brought or threatened to be brought under this section by the State of Arkansas through the Attorney General shall be required to pay to the Attorney General all reasonable expenses which the court determines have been necessarily incurred in the enforcement of this chapter.

Ark. Code Ann. § 5-28-106 (Supp. 2001).

The Sauer Estate urges that the jury award of $15 million, virtually all of which is due to pain and suffering, cannot be reduced. It points to the Arkansas Constitution which reads that the "right of trial by jury shall remain inviolate[.]" Ark. Const. art. 2, § 7. At oral argument, counsel for the Sauer Estate opined that even if the compensatory damages for pain and suffering had been $100 million against each appellant corporation, it would still have been unassailable as excessive. We disagree. We further disagree that the circuit judge had no discretion in reducing an excessive jury verdict.

One treatise on damages has described the jury's dilemma inherent in any pain-and-suffering evaluation:

> Pain and suffering have no market price. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured. Hence, the amount of damages to be awarded for them must be left to the judgment of the jury, subject only to correction by the courts for abuse and passionate exercise. One of the most difficult decisions facing the jury in a personal injury case is the size of the monetary award for pain and suffering, since there is no objective method of evaluating such damages. The question in any given case is not what sum of money would be sufficient

to induce a person to undergo voluntarily the pain and suffering for which recovery is sought or what it would cost to hire someone to undergo such suffering, but what, under all the circumstances, should be allowed the plaintiff in addition to the other items of damage to which he or she is entitled, in reasonable consideration of the pain and suffering necessarily endured or to be endured. The amount allowed must be fair and reasonable, free from sentimental or fanciful standards, and based upon the facts disclosed.

2 *Stein on Personal Injury Damages*, § 8:8, at 8-19 (3d ed. 1997) (footnotes omitted). *See also Howard Brill, Arkansas Law of Damages*, § 29-2, pp. 551-52 (4th ed. 2002).

Appellate courts have an equally difficult time in reviewing awards for pain and suffering. The same treatise concludes: "When appeals courts do overturn an award, they are generally expected to provide an amount 'a reasonable person would estimate as fair compensation.'" 2 *Stein on Personal Injury Damages*, § 8:8, at 8-54 (3d ed. 1997) (citing *Restatement (Second) of Torts* § 912 cmt. b (1979)).

■■ Our rules and case law make it clear that it is incumbent upon the courts to determine whether a jury award is clearly excessive. *See* Ark. R. Civ. P. 59(a)(4)-(5); *McElroy v. Benefield, supra.* The remedy for an excessive-damages award is for the court to grant a remittitur. *See, e.g., United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998). This remedy dates back to 1841 in our case law. *See Fulton v. Hunt*, 3 Ark. 280 (1841). Remittitur can be applied to compensatory damages as well as to punitive damages. *See, e.g., Johnson v. Gilliland, supra; Shepherd v. Looper*, 293 Ark. 29, 732 S.W.2d 150 (1987).

Remittitur has been used by this court in the past on numerous occasions. *See, e.g., Johnson v. Gilliland, supra* (holding that evidence supported a remittitur of $10,000 from $20,250 in gross negligence action); *Fisher Trucking, Inc. v. Fleet Lease, Inc.*, 304 Ark. 451, 803 S.W.2d 888 (1991) (holding remittitur of $317,078.28 from $1,000,000 for breach of lease); *Scheptmann v. Thorn*, 272 Ark. 70, 612 S.W.2d 291 (1981) (affirming on condition of remittitur of $25,000 from $50,000 for loss of consortium); *Anheuser-Busch, Inc. v. McAlpin*, 262 Ark. 907, 562 S.W.2d 72 (1978) (hold-

ing verdict was highly speculative and warranted remittitur reducing $10,000 award to $3,000 on claim for damages from drinking a bottle of beer containing a foreign substance); *Browder v. Gahr*, 258 Ark. 992, 530 S.W.2d 359 (1975) (reducing judgment from $30,000 to $20,000 in personal injury action); *Scott v. Jansson*, 257 Ark. 410, 516 S.W.2d 589 (1974) (reducing award for loss of consortium from $25,000 to $10,000); *Arkansas State Highway Comm'n v. Bradford*, 252 Ark. 1037, 482 S.W.2d 107 (1972) (holding actual damages were only $24,878 and ordering remittitur from $26,500 in action to take land); *Duty v. Gunter*, 234 Ark. 176, 350 S.W.2d 908 (1961) (holding award of $7,500 was excessive and should be reduced to $3,500 in action for damages stemming from automobile collision); *Union Motor Co. v. Turbiville*, 223 Ark. 92, 264 S.W.2d 592 (1954) (reducing award of $800 to $647.18 in an action for damages for misrepresentation); *Daniels v. Allen*, 206 Ark. 1155, 178 S.W.2d 853 (1944) (reducing judgment from $20,000 to $10,000 for personal injuries).

We hold that while the compensatory damages awarded in this case were not the result of passion or prejudice, they do shock the conscience of this court. Nevertheless, the issue still remains: What is an appropriate measure for reduction? Again, virtually all of the damages awarded were for pain and suffering. The jury awarded $5 million for negligence and $10 million for medical malpractice, with the three appellant corporations to be held jointly and severally liable. No doubt the jury focused on Mrs. Sauer's age and medical condition at the time of her death, the extent of her misery, and the absence of care she received for the period leading up to her death. Testimony by the Sauer Estate's witness, Mary Margaret Hamlett, was clear, though, that the three appellants operated Rich Mountain as one business. This court concludes that the three appellants did operate Rich Mountain as one business, which the circuit court acknowledged in its comments from the bench. We further hold that the circuit court abused its discretion in not granting a new trial based on excessive damages or by ordering a remittitur of damages. Though we are cognizant of the fact that separate verdict forms were returned for each appellant on negligence and medical malpractice, we are persuaded that a reasonable basis for remittitur is to reduce the negligence and medical malprac-

tice awards by two-thirds. We grant the remittitur and reduce the total damage award for negligence and medical malpractice from $15 million to $5 million, with joint and several liability. We affirm the judgment award on condition of remittitur as stated at the conclusion of this opinion.

## II. Excessive Punitive Damages

Appellants next argue that the evidence was insufficient to support an award of punitive damages in that although the testimony presented may have been evidence of negligence, it was not evidence of conscious or reckless disregard of known or probable consequences, from which malice can be inferred, as required for an award of punitive damages under state law. Appellants further contend that the punitive-damage awards are an unlawful taking and violate their due process rights under the United States Constitution under the holding of the United States Supreme Court in *BMW of North America, Inc. v. Gore, supra.*

### a. Insufficient Evidence

■ Appellants' first argument that there was insufficient evidence to support the award of punitive damages in this case is not preserved for this court's review. Arkansas Rule of Civil Procedure 50(e) requires that where "there has been a trial by jury, the failure of a party to move for a directed verdict at the conclusion of all the evidence, because of insufficiency of the evidence will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the jury verdict." We conclude that "at the conclusion of the evidence" means exactly that — when all the evidence is in.

■ ■ In the criminal context, this court has held that a defendant must renew a motion for directed verdict following any rebuttal testimony put on by the State in order to preserve a sufficiency-of-the-evidence argument under Ark. R. Crim. P. 33.1. *See, e.g., Grady v. State,* 350 Ark. 160, 85 S.W.3d 531 (2002). In *Grady,* this court cited Ark. R. Crim. P. 33.1 and held "the close of all the evidence," occurred after the State's rebuttal testimony, and that the defendant's failure to renew his motion for directed verdict

following the State's rebuttal proof precluded appellate review. The same reasoning applies here. The evidence was not concluded until the Sauer Estate had put on its rebuttal testimony to the appellants' defense. Accordingly, the "conclusion of all the evidence" occurred after the Sauer Estate's rebuttal evidence. *See* Ark. R. Civ. P. 50(e). Because the appellants failed to renew their motion for directed verdict following the conclusion of the Sauer Estate's rebuttal, they waived any question pertaining to the sufficiency of the evidence to support the jury's award of punitive damages.

### b. Arkansas Common Law

The appellants contend that the punitive damages are excessive under Arkansas law and, in addition, violate their due process rights under *BMW of North America, Inc. v. Gore, supra.* In 1998, this court set out a compendium of Arkansas law related to remittitur and punitive damages:

> When considering the issue of remittitur of punitive damages, we review the issue *de novo. See Smith v. Hansen,* 323 Ark. 188, 914 S.W.2d 285 (1996). We consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. *See United Ins. Co. of America v. Murphy,* 331 Ark. 364, 961 S.W.2d 752 (1998); *McLaughlin v. Cox,* 324 Ark. 361, 922 S.W.2d 327 (1996). Punitive damages are a penalty for conduct that is malicious or perpetrated with the deliberate intent to injure another. *See United Ins. Co., supra.* When punitive damages are alleged to be excessive, we review the proof and all reasonable inferences in the light most favorable to the appellees, and we determine whether the verdict is so great as to shock the conscience of this court or to demonstrate passion or prejudice on the part of the trier of fact. *See Houston v. Knoedl,* 329 Ark. 91, 947 S.W.2d 745 (1997); *Collins v. Hinton,* 327 Ark. 159, 937 S.W.2d 164 (1997). It is important that the punitive damages be sufficient to deter others from comparable conduct in the future. *See McLaughlin v. Cox, supra.*

*Routh Wrecker Service v. Washington,* 335 Ark. 232, 240-241, 980 S.W.2d 240, 244 (1998). The conscious indifference of the alleged wrongdoer to the wrong committed is a pertinent factor in

assessing punitive damages. *See United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998).

 We begin by observing that the extent and the enormity of the wrong done to Mrs. Sauer are considerable. As already emphasized in this opinion, there was evidence that the appellants knew Rich Mountain was short-staffed, including surveys by the Office of Long Term Care, but took no measures to rectify the situation. Indeed, there were attempts to disguise this fact. Also, the Advocat business enterprise appears to be sizeable. The appellants make much of the fact that they were precluded from offering financial information at a posttrial hearing. But we agree with the circuit court that the appellants could not have it both ways. The appellants first objected to any requirement that they divulge financial information at trial. The circuit court sustained the objection. They cannot now, postverdict, seek a remedy that they themselves shut the door to during the trial. The circuit court correctly disallowed the request. The same holds true of the appellants' passionate argument in favor of a postverdict excessiveness hearing to introduce financial information they objected to at trial. We know of no procedure authorized in this state by rule or statute providing for such an evidentiary hearing under these circumstances. We decline to authorize one in the instant case.

Although the appellants argue that the circuit court erred in not allowing them to place additional financial information into evidence posttrial for the consideration of whether the punitive damages were excessive or to conduct a posttrial excessiveness hearing for that same purpose, there was information presented to the jury relating to the scope of the nursing home business controlled by Advocat, albeit specific financial numbers were not introduced. Mary Margaret Hamlett, who served as Chief Financial Officer for Advocat, Inc., from May 10, 1994, until June 30, 1999, testified by video deposition that the leasehold interest of the Rich Mountain Nursing Home was owned by Diversicare Leasing Corp. and the management of the home was conducted by Diversicare Management Services. Her diagram of the corporate structure, from memory, was that the parent corporation was Advocat, Inc., which had two subsidiaries, Diversicare Management Services Co., and Diversicare Leasing Corp., d/b/a Rich Mountain. Rich Mountain was

part of Diversicare Leasing Corp. and was managed by Diversicare Management Services. From the company's perspective, these three corporations were operated as one business, according to Ms. Hamlett. She stated that during the relevant time period, the company had in the vicinity of 11,000 beds, including Canadian operations and North Carolina assisted living operations. In addition, Ms. Hamlett testified that according to an Advocat news release, Advocat operated 86 facilities with 64 nursing homes with 7,300 beds in the southeast and Canada. Advocat was also listed on the New York Stock Exchange in 1996, 1997, and 1998, according to Ms. Hamlett. From this testimony, it appears that Advocat oversaw a major business enterprise.

 Viewing all of the pertinent evidence together, we conclude that punitive damages were indeed appropriate in this case. The question, however, as was the case with compensatory damages, is the amount of those damages. We conclude that an award of $63 million in punitive damages shocks the conscience of this court as a civil penalty. We will consider what remittitur is appropriate after an analysis under *BMW of North America, Inc. v. Gore, supra*. Again, what impacts this court is that the three appellants operated Rich Mountain as one business.

c. Due Process Violations

 We turn next to the appellants' contention that their due process rights were violated under *BMW of North America, Inc. v. Gore, supra*, because they had no prior notice that an award of this magnitude could be entered against them as a penalty in Arkansas. In the *Gore* case, the issue was whether BMW failed to disclose to the buyer of a new BMW automobile that the car had been repainted. The jury awarded the buyer compensatory damages of $4,000 and punitive damages of $4 million. The Alabama Supreme Court reduced the punitive damage award to $2 million. The United States Supreme Court reversed that award of punitive damages. The Court said in its analysis that "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." 517 U.S. at 568. In

order to make this determination, the Court added that it is necessary for the courts to examine the scope of the State's legitimate interest in punishing the defendant and deterring future misconduct. However, a State may not impose its own policy choice on neighboring states. *See id.* Accordingly, the Court concluded that a State may not "impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572.

In order to determine whether an award of punitive damages is grossly excessive and runs afoul of due process under *Gore*, the Court provided three criteria to be used to determine whether a tortfeasor received adequate notice of both the conduct that would subject him to punishment and the magnitude of the sanction a State might impose: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized by statute or imposed in comparable cases. *See id.* This court has employed the *Gore* analysis in at least two previous cases. *See Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998); *Routh Wrecker Serv., Inc. v. Washington, supra* (both using the *Gore* factors to analyze whether punitive damages were grossly excessive and violated due process).

A *Gore* analysis is performed in the appellate court by using a *de novo* review. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001). Most recently, the United States Supreme Court emphasized that punitive damages pose an acute danger of arbitrary deprivation of property. *See State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408. In that case, one person was killed and another permanently injured in a car accident caused by Campbell. State Farm, the liability carrier for Campbell, refused to settle the matter for the $50,000 policy limits. The case went to trial, and the jury verdict was three times the policy limits. State Farm did not appeal. Campbell sued State Farm for bad faith, fraud, and outrage. Ultimately, the jury awarded the Campbells $2.6 million in compensatory damages and $145 million in punitive damages. The trial court reduced the damages verdict to $1 million compensatory and $25 million

punitive, but the Utah Supreme Court reinstated the original verdict.

The United States Supreme Court held that the $145 million in punitive damages was neither reasonable nor proportionate to the wrong committed and constituted an irrational and arbitrary deprivation of State Farm's property. In holding as it did, the Court used the *Gore* criteria and emphasized that the case had improperly been used as a platform to punish State Farm for its perceived deficiencies throughout the country regarding hypothetical nonparties. The Court noted also that there was scant evidence that State Farm had engaged in repeated misconduct of the sort that damaged the Campbells. We will proceed to discuss the *Gore* criteria. Though the Sauer Estate's counsel disputed this at oral argument, we conclude that the three *Gore* criteria must be given equal weight.

### (i) Degree of Reprehensibility

As to the first criterion, the Court said that "exemplary damages imposed on a defendant should reflect 'the enormity of his offense.'" *Gore*, 517 U.S. at 575. Accordingly, the Court held in that case (1) where the harm inflicted by the tortfeasor was "purely economic in nature[,]" (2) there was no evidence that the tortfeasor had acted in bad faith, (3) there was no evidence that the tortfeasor had "persisted in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions[,]" and (4) the record failed to disclose any "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive," the tortfeasor's conduct was not sufficiently reprehensible to warrant the imposition of a $2 million award. *Id.* at 576-80.

In *State Farm Mut. Ins. Co. v. Campbell, supra,* the Court elaborated on factors for consideration when assessing reprehensibility: "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of

intentional malice, trickery, or deceit, or mere accident." 538 U.S. at 419.

■ In the case at hand, the harm inflicted by the appellants was not purely economic in nature. Mrs. Sauer suffered, and there was considerable evidence introduced that budgetary constraints contributed to a diminished staff and inadequate supplies. In addition, the appellants knew by virtue of the surveys by the Office of Long Term Care that they were understaffed with nurses at Rich Mountain and that this directly related to patient care. This understaffing continued even after complaints by staff members, patients, and family members. Furthermore, the record in this case reveals deliberate false entries on patient charts and efforts to conceal this evidence. We have no hesitancy in concluding that the reprehensibility of the appellants' conduct in this case was high.

### (ii) Ratio

■ In *Gore*, the Court noted that its prior decisions had endorsed "the proposition that a comparison between the compensatory award and the punitive award is significant." 517 U.S. at 581. The Court further noted its rejection of the idea that the "constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award." *Id.* at 582 (emphasis in original). The Court concluded that in most instances, the ratio will be within a constitutionally acceptable range. *See id.* at 583. However, where the ratio is "breathtaking," the award will surely "raise a suspicious eyebrow." *Id.*

In the instant case, the jury awarded the Sauer Estate compensatory damages of $15,000,000 for negligence and medical malpractice. We have already concluded that these damages shock the conscience of this court and that a remittitur to $5 million is appropriate. As the jury awards approved by the circuit court stand, the $63 million in punitive damages is roughly 4.2 times the amount of the compensatory damages, as originally determined by the jury. As noted in *Gore*: "In [*Pacific Mut. Life Ins. Co. v.*] *Haslip* [, 499 U.S. 1 (1991)] we concluded that even though a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it did not

'cross the line into the area of constitutional impropriety.'" 517 U.S. at 581. Most recently, the Court has held that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1, . . . or, . . . of 145 to 1." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. at 425.

We cannot say that the ratio of punitive damages to compensatory damages, which is 4.2, is "breathtaking" in the instant case.

(iii) Civil Sanctions for Misconduct and Comparable Cases

The final factor adopted by the United States Supreme Court in *Gore* for adequate notice is that of comparing the punitive damages award to the civil or criminal penalties that could be imposed for similar misconduct. In this case, the punitive damages award is substantially greater than the statutory penalties set forth in the Arkansas Code. As set out above, Ark. Code Ann. § 5-28-106 (Supp. 2001), authorizes the State of Arkansas to pursue a civil action against any long-term care facility for neglect of its patients. *See* Ark. Code Ann. § 5-28-106(a)(1). Notwithstanding any criminal penalties available under the chapter, any caregiver against whom a judgment is entered as a result of a civil action brought by the State for neglect or abuse of an endangered or impaired adult shall be subject to a civil penalty of not more than $10,000 for each violation judicially found to have occurred or not more than $50,000 for the death of an adult resulting from a single violation.[3] *See* Ark. Code Ann. § 5-28-106(a)(2). In the instant case, the record does not reveal a specific number of civil violations committed against Mrs. Sauer.

The same can also be said for criminal penalties. Our Criminal Code sets forth the criminal penalties for adult abuse. *See* Ark. Code Ann. § 5-28-103 (Repl. 1997). For neglect, the statute authorizes the following criminal sanction:

---

[3] For purposes of the chapter, adult residents of long-term facilities are presumed to be impaired adults. *See* Ark. Code Ann. § 5-28-101(7)(B) (Supp. 2001).

(c)(1) Any person or caregiver who neglects an endangered or impaired adult in violation of the provisions of this chapter, causing serious physical injury or substantial risk of death, shall be guilty of a Class D felony and shall be punished as provided by law.

(2) Any person or caregiver who neglects an endangered or impaired adult in violation of the provisions of this chapter, causing physical injury, shall be guilty of a Class B misdemeanor and shall be punished as provided by law.

Ark. Code Ann. § 5-28-103(c) (Repl. 1997). Both civil and criminal penalties are assessed based upon specific violations of abuse, neglect, or exploitation. *See* Ark. Code Ann. §§ 5-28-103, 5-28-106. Neglect is defined under the Criminal Code as follows:

(8) "Neglect" means acts or omissions by an endangered adult; for example, self-neglect or intentional acts or omissions by a caregiver responsible for the care and supervision of an endangered or impaired adult constituting:

(A) Negligently failing to provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an endangered or impaired adult;

(B) Negligently failing to report health problems or changes in health problems or changes in the health condition of an endangered or impaired adult to the appropriate medical personnel; or

(C) Negligently failing to carry out a prescribed treatment plan[.]

Ark. Code Ann. § 5-28-101(8) (Supp. 2001).

Appellants claim that it ludicrous to conclude that Mrs. Sauer suffered 6,300 violations under the subchapter to substantiate a punitive-damages award of $63 million. However, it appears from the definition of the term "neglect" that it is impossible to know how many violations might have occurred; nor have the appellants suggested a more appropriate number. Moreover, the jury verdicts from other jurisdictions cited in the circuit court's letter opinion do not inform this court about whether those cases were ultimately settled or appealed and affirmed.

 The highest punitive-damages award affirmed by this court is $3 million. *See Airco, Inc. v. Simmons First Nat. Bank*, 276 Ark. 486, 638 S.W.2d 660 (1982). The highest punitive-damages

award affirmed by our court of appeals on appeal is $4 million. *See Arrow Int'l, Inc. v. Sparks*, 81 Ark. App. 42, 98 S.W.3d 48 (2003). We conclude, as we did with compensatory damages, that the punitive damages awarded, while not the result of passion or prejudice, shock the conscience of this court. They are far and away in excess of any other punitive-damages award in this state, which, while not the determinative factor, is instructive. Under our analysis, the third criterion in *Gore* has not been met.

 We hold that the circuit court abused its discretion in not granting a new trial due to excessive punitive-damages awards or, alternatively, in failing to grant a remittitur. We further hold that under Arkansas law and under the three *Gore* factors, $63 million was a grossly excessive award and one that could not have been anticipated by the appellants, particularly since the largest award of punitive damages affirmed in this state on appeal heretofore has been $4 million. We grant the remittitur and reduce the amount of the total punitive damages awarded by two-thirds to $21 million, and provide for joint and several liability. We do so on the basis that this is reasonable under our *de novo* review. We conclude that one business is involved in the management of Rich Mountain and that it shocks the conscience of this court to award the same amount of punitive damages against the parent company and the two subsidiary companies. We will affirm the judgment only on condition of remittitur as stated in the conclusion of this opinion.

### III. Long-Term Care Surveys

Appellants next argue that the circuit court erred in admitting into evidence two redacted State of Arkansas Office of Long Term Care (OLTC) surveys, one from January 1997 and one from May 1998. Appellants assert the surveys contained unsubstantiated complaints about the care of residents other than Mrs. Sauer and findings by the OLTC that Rich Mountain had violated certain Medicare reimbursement regulations. They contend that evidence of the treatment of other patients is not relevant to Mrs. Sauer's care. They further contend that the circuit court abused its discretion under Arkansas Rules of Evidence 402 and 403 by admitting the irrelevant and prejudicial evidence.

Relevant evidence is that evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* Ark. R. Evid. 401. All relevant evidence is admissible, while irrelevant evidence is not. *See* Ark. R. Evid. 402. Although evidence may be relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *See* Ark. R. Evid. 403. This court has held that the trial court has broad discretion in decisions of admissibility, and we will not reverse its ruling absent an abuse of this discretion. *See National Bank of Commerce v. Beavers,* 304 Ark. 81, 802 S.W.2d 132 (1990).

We believe that the surveys completed by the OLTC in January 1997 and May 1998 were relevant to the instant case. The Sauer Estate put on substantial evidence of ways in which Mrs. Sauer suffered while a resident at Rich Mountain, much of which centered on inadequate staff and nursing care available to Mrs. Sauer. Any evidence having a tendency to make these allegations more or less probable would be relevant. Clearly, the OLTC's findings that Rich Mountain was not meeting OLTC's requirements regarding adequate nursing staff were relevant as to whether the Sauer Estate's allegations of lack of patient care were true. In the January 1997 survey, OLTC made the following conclusion, which it supported by several findings:

> Based on observation, record review, and interview, the facility failed to provide adequate nursing staff for 13 of 13 residents on the case mix assistance to feed at mealtime, turn and reposition, provide incontinent care, serve food and obtain treatment orders, serve meals in a timely manner, and get residents up in chairs at mealtimes.

A similar conclusion was reached by OLTC in its May 1998 survey:

> Based on observations, record review and interview, the facility failed to provide sufficient nursing staff to provide nursing and related services necessary to provide quality care for 21 of 21 case mix residents.

Each OLTC survey notified appellants of examples of the manner in which Rich Mountain failed to meet the needs of its patients due to inadequate staffing. Whether the patients at Rich Mountain suffered from inadequate nurse staffing pertaining to personal hygiene, feeding, and treatment would certainly have a bearing on whether the allegations made by the Sauer Estate about the lack of quality care afforded to Mrs. Sauer were more or less probable. Moreover, the surveys are probative of the fact that the appellants were on notice of dangerous conditions in the nursing home due to understaffing. *See Ex parte McCullough*, 747 So. 2d 887 (Ala. 1999) (superseded in part by amendment to statute dealing with prohibition of discovery for other acts or omissions); *Montgomery Healthcare Facility, Inc. v. Ballard*, 565 So. 2d 221 (Ala. 1990) (superseded in part by enactment of statute dealing with prohibition of discovery for other acts or omissions). *Cf. Berry v. St. Paul Fire & Marine Ins. Co.*, 328 Ark. 553, 944 S.W.2d 838 (1997) (affirming trial court's finding that survey letters were irrelevant to issue of decedent's type of care but if plaintiff laid a foundation tying deficiencies to death, may be admissible; plaintiff failed to do so). Because the OLTC surveys were relevant, they were admissible unless their probative value was substantially outweighed by the danger of unfair prejudice or they would mislead the jury.

 The mere fact that evidence is prejudicial to a party is not, in itself, a reason to exclude it. *See Marvel v. Parker*, 317 Ark. 232, 878 S.W.2d 364 (1994). The danger of unfair prejudice must substantially outweigh the probative value of the evidence. *See id.* The probative value of the OLTC surveys was great. Not only did the surveys show that Rich Mountain was understaffed during the relevant time period, but they also served as evidence that Rich Mountain was put on notice of its failure to address adequacy-of-staff issues in 1997. Although the surveys undoubtedly were prejudicial to appellants, that prejudice did not outweigh the strong probative value of the surveys. We affirm the circuit court on this point.

### IV. Insufficient Evidence of Liability

For their next point, the appellants argue that the evidence was insufficient to prove negligence or medical malpractice against

either Diversicare Management or Advocat, and as a result, the circuit court should have granted their motion for judgment notwithstanding the verdict. Appellants further contend that the Sauer Estate failed to prove that each entity "took some action that proximately caused Mrs. Sauer damage." Additionally, the appellants claim that the Sauer Estate failed to show that the administrator of Rich Mountain played any part in the care of Mrs. Sauer; nor was there any evidence that Advocat or any of its employees failed to act in the care of Mrs. Sauer. Further, as to medical malpractice, the appellants contend that neither of the Sauer Estate's expert witnesses testified to any knowledge of the local standard of care governing claims for medical injuries as required under the Medical Malpractice Act or that Dr. Leonard Williams testified to any opinion with a reasonable degree of medical certainty.

We conclude that appellants' arguments are not preserved for this court's review. As already referenced in this opinion, Ark. R. Civ. P. 50(e) requires that where there has been a trial by jury, a party's failure to move for a directed verdict "at the conclusion of all the evidence" constitutes a waiver of any question pertaining to the sufficiency of the evidence to support the jury's verdict. Here, appellants concede that although they renewed their motion for directed verdict at the close of the Sauer Estate's case-in-chief, and after putting on their own evidence, they failed to do so following the estate's rebuttal witness. Hence, this court is precluded from reviewing their allegations of insufficiency of the evidence as to liability.

## V. Duplicate Damages

The appellants next argue that, over their objection, the circuit court submitted six separate verdict forms to the jury, four of which forms contained special interrogatories for each of the three appellants relating to negligence, medical malpractice, breach of contract, and wrongful death. Indeed, the appellants point out that they submitted a general verdict form, as an alternative for consideration by the jury, and it was rejected. The appellants assert that the jury did not know how to segregate damages for the different legal theories and that, as a consequence, its verdicts for

negligence and medical malpractice awarded duplicative recoveries for the same injuries. They contend that the jury did not know that Arkansas law prohibits multiple recoveries for the same injuries. They further maintain that the verdict forms asked the jury to assess damages on each separate claim without considering whether the awards were duplicative. The appellants contend that the circuit court should have recognized the risk of double recovery when the defense objected to "submitting multiple verdict forms for multiple remedies."

We initially observe that this issue of duplication involves only the compensatory damages and not the punitive damages, as the objection made by appellants related only to "multiple theories" for relief which resulted in the compensatory damages. Secondly, we have some question about whether the appellants preserved this issue for the court's review due to an insufficient record. Although the abstract does not reflect a ruling on the appellants' objection to the multiple verdict forms, the record does reflect that the trial court ruled, stating "Same ruling." This court, of course, can go to the record to affirm. *See Hosey v. Burgess*, 319 Ark. 183, 890 S.W.2d 262 (1995). In the context presented, it appears that the "same ruling" was to deny the objection to multiple verdict forms for multiple parties.

We disagree, nevertheless, that the verdict forms were confusing to the jury. The following forms were given to the jury and completed as indicated:

VERDICT FORM: COUNT I — ORDINARY NEGLIGENCE

Do you find from a preponderance of the evidence that there was negligence on the part of Advocat, Inc. that was the cause of the damages or injuries sustained by Margaretha Sauer?

✓Yes No

Do you find from a preponderance of the evidence that there was negligence on the part of Diversicare Leasing Corporation d/b/a Rich Mountain Nursing and Rehabilitation Center that was the cause of the damages or injuries sustained by Margaretha Sauer?

✓Yes No

Do you find from a preponderance of the evidence that there was negligence on the part of Diversicare Management Services Co. that was the cause of the damages or injuries sustained by Margaretha Sauer?

✓Yes No

If you answered "yes" to any of the above questions, please proceed:

On the claim for ordinary negligence, we, the jury award damages as follows:

Estate of Margaretha Sauer $5 million

## VERDICT FORM: COUNT II — MEDICAL MALPRACTICE

Do you find from a preponderance of the evidence that Advocat, Inc. failed to use reasonable care in treating Margaretha Sauer with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality, which was the proximate cause of any damages to Margaretha Sauer?

✓Yes No

Do you find from a preponderance of the evidence that Diversicare Leasing Corporation d/b/a Rich Mountain Nursing and Rehabilitation Center failed to use reasonable care in treating Margaretha Sauer with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality, which was the proximate cause of any damages to Margaretha Sauer?

✓Yes No

Do you find from a preponderance of the evidence that Diversicare Management Services Co. failed to use reasonable care in treating Margaretha Sauer with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality, which was the proximate cause of any damages to Margaretha Sauer?

✓Yes No

If you answered "yes" to any of the above questions, please proceed:

On the claim for Medical Malpractice, we, the jury award damages as follows:

Estate of Margaretha Sauer: <u>$10 million</u>

 Turning to the merits, we have already held in this opinion that the three appellants operated Rich Mountain as one business for purposes of gauging excessive compensatory damages and that the jury's $15 million award for pain and suffering associated with negligence and medical malpractice shocked the conscience of this court. We ordered remittitur of the award by two-thirds and confirmed the imposition of joint and several liability. However, we do not view that holding in the context of excessive damages as dispositive of the issue of duplicative damages. The appellants argue that the jury was confused and because of that confusion awarded double or even triple recovery to the Sauer Estate. Rather than confusing, the verdict forms appear to delineate the claims for relief and the parties. If there was confusion, it was in not distinguishing ordinary negligence from medical malpractice. However, the record does not reflect any attempt by the appellants to offer a clarifying instruction on this point. Under the circumstances, we cannot say the circuit court abused its discretion in instructing the jury as it did.

### VI. Inherently Erroneous and Binding Instructions

The appellants further argue that the circuit court submitted inherently erroneous instructions to the jury by instructing the jury that it should find against all three appellants even if only one of the three appellants committed the tortious conduct and by directing the jury to impose liability against all three appellants for the actions of one. In addition, the appellants contend that the instructions were erroneous because the circuit court modified model jury instruction AMI 205 to include the "verdict-directing final bracketed paragraph of AMI 205 even though the case was submitted on interrogatories." The appellants note that although they did not specifically object to these instructions on the precise ground that they were inherently erroneous and binding instructions, they made general objections against submitting the negligence, medical malpractice, and wrongful death instructions. They submit that under Arkansas caselaw, a general objection is all

that is necessary to attack the validity of an inherently erroneous, binding instruction on appeal. Regarding AMI 205, they submit that it was the independent duty of the circuit court to give the instructions as written and set forth in the model jury instructions unless particular circumstances require a modification. Here, they argue that the circumstances did not.

■ ■ An inherently erroneous instruction is one that could not be correct under any circumstance. *See Koch v. Missouri Pac. R.R. Co.*, 248 Ark. 1251, 455 S.W.2d 858 (1970). Where an instruction is inherently erroneous, a general objection to it will suffice. *See Missouri Valley Bridge & Iron Co. v. Malone*, 153 Ark. 454, 240 S.W. 719 (1922). This court has held that an erroneous instruction, which is likely to mislead the jury, is prejudicial. *See Long v. Lampton*, 324 Ark. 511, 922 S.W.2d 692 (1996). However, although the court will presume prejudice from the giving of an erroneous instruction, the error may be rendered harmless by other factors in the case. *See id.*

In the instant case, the appellants take issue with the following instruction:

> [In proving negligence, t]he Estate of Margaretha Sauer . . . has the burden of proving each of three essential propositions: . . . Second, that Advocat, Inc.; Diversicare Leasing Corporation d/b/a Rich Mountain Nursing and Rehabilitation Center; and Diversicare Management Services Co. or one of them failed to use reasonable care in providing custodial nursing home care to Margaretha Sauer.

The appellants also take issue with similar wording in the instructions for medical malpractice and wrongful death.

We disagree that this instruction is incorrect under any circumstance and, thus, we conclude it is not inherently erroneous. Clearly, the jury could find that all three appellants, or only one of them, failed to use reasonable care. Presumably, the jury could also find that two of the three appellants failed to do so. Regardless, if the appellee proved that one, two, or even all three of the appellants failed to use reasonable care, that the Sauer Estate sustained damages, and that such negligence was a proximate cause of

the damages, it was proper for the jury to enter a verdict in favor of the estate. That is a correct statement of the law.

Moreover, the circuit court took pains to instruct the jury that each appellant was entitled to a fair consideration of "his own defense:"

> Although there is more than one defendant in this action, it does not follow from that fact alone that if one is at fault, both are at fault. Each is entitled to a fair consideration of his own defense and is not to be adversely affected by your findings with respect to the other. The instructions and the evidence govern the case as to each defendant, insofar as they are applicable to him. To the same effect as if he were the only defendant in the action. You will decide each defendant's case separately as if each were a separate lawsuit.

Thus, the verdict forms further demonstrate that the jury was to consider each appellant on its own accord. For example, *Verdict Form: Count I — Ordinary Negligence* provided:

> Do you find from a preponderance of the evidence that there was negligence on the part of Advocat, Inc. that was the cause of the damages or injuries sustained by Margaretha Sauer?
>
> ____Yes ____No
>
> Do you find from a preponderance of the evidence that there was negligence on the part of Diversicare Leasing Corporation d/b/a Rich Mountain Nursing and Rehabilitation Center that was the cause of the damages or injuries sustained by Margaretha Sauer?
>
> ____Yes ____No
>
> Do you find from a preponderance of the evidence that there was negligence on the part of Diversicare Management Services Co. that was the cause of the damages or injuries sustained by Margaretha Sauer?
>
> ____Yes ____No
>
> If you answered "yes" to any of the above questions, please proceed:

On the claim for ordinary negligence, we, the jury, award damages as follows:

Estate of Margaretha Sauer $_____

 We conclude that when the instructions are read as a whole, the jury could not have been misled. *See, e.g., Arkansas Louisiana Gas Co. v. McGaughey, Bros., Inc.,* 250 Ark. 1083, 468 S.W.2d 754 (1971). The instructions were not inherently erroneous.

 This court has also discussed in detail when an instruction is binding:

> This instruction, reasons appellant, is *binding* because it concludes with the phrase "your verdict must be for the defendant," and is erroneous because it required the jury to find for appellee if any negligence on the part of appellant was shown, irrespective of whether such negligence caused or contributed to appellant's injury.
>
> . . . .
>
> The concluding phrase "you will find for the plaintiff" or "you will find for the defendant" is the mark of a binding instruction. *Reynolds v. Ashabranner,* 212 Ark. 718, 207 S.W.2d 304; and where a binding instruction is given which ignores an essential issue on which evidence conflicts, reversible error is committed, even though a separate instruction correctly defines such issue. *Vaughan v. Herring,* 195 Ark. 639, 113 S.W.2d 512.
>
> The rule has been applied where an instruction purports to recite conditions under which recovery should be granted or denied, but requires the jury to find for a particular party without mention of such controverted affirmative defenses as assumption of risk, (*Garrison Company v. Lawson,* 171 Ark. 1122, 287 S.W. 396), contributory negligence, (*Natural Gas & Fuel Co. v. Lyles*), 174 Ark. 146, 294 S.W. 395), adverse possession, (*Bayles v. Daugherty,* 77 Ark. 201, 91 S.W. 304), and others.
>
> *The purpose of instructions is to inform the jury of the legal principles applicable to the facts presented, and furnish a guide to assist in reaching a verdict. They are ordinarily read to the jury with continuity and unless contradictory as a matter of law must be considered as a whole. If, when so considered, the legal issues presented are properly explained, no prejudice results. St. Louis I. M. & S. Railroad Co. v. Rogers,* 93 Ark. 564, 126 S.W. 375, 1199.
>
> Tested by this standard, the present charge is sufficient.

*Hearn v. East Texas Motor Freight Lines,* 219 Ark. 297, 298-300, 241 S.W.2d 259, 260-61 (1951) (emphasis added). The same holds true in the case at hand. When the instructions are read as a whole, we hold that they are not binding.

The appellants, finally, take issue with the fact that the trial court included the "verdict-directing final bracketed paragraph of AMI 205 even though the case was submitted on interrogatories." That bracketed paragraph reads: "If you find from the evidence in this case that each of these propositions has been proved, then your verdict should be for [the claiming party] (against the party or parties found to be liable); but if, on the other hand, you find from the evidence that any of the propositions has not been proved, then your verdict should be for [party being sued]." The *Notes on Use* to AMI Civ. 4th 205 state that the final bracketed paragraph should not be used when the case is submitted on interrogatories. The instant case, of course, was submitted on interrogatories.

We disagree with the appellants that giving the bracketed part of AMI 205 rendered the instruction inherently erroneous under all circumstances. Thus, a general objection does not suffice. Rather, this is a situation where counsel for the appellants should have specifically objected to the error. He did not. This court has made it clear: "In order to preserve the issue for appellate review, when objecting to the giving of an erroneous instruction, one must make a timely and specific objection to the instruction the trial court intends to give; when objecting to the trial court's failure to give an instruction, the objector must offer an alternative instruction which he or she believes to be the correct statement of the law." *Acme Brick Co. v. Missouri Pac. R.R. Co.,* 307 Ark. 363, 366-67, 821 S.W.2d 7, 9 (1991) (citation omitted). This issue of AMI 205 is not preserved for our review.

### VII. Conclusion

We hold that the circuit court abused its discretion by not granting a new trial due to excessive damages under Ark. R. Civ. P. 59(a)(4) and (5). If, within eighteen days, the Sauer Estate remits $10 million of the $15 million compensatory damages, leaving a compensatory damage award of $5 million, with joint and several liability, and further remits $42 million of the $63 mil-

lion punitive damages, leaving a punitive damages award of $21 million, also with joint and several liability, the judgment will be affirmed. Otherwise, the case will be reversed, and the cause will be remanded for a new trial. *See Fisher Trucking, Inc. v. Fleet Lease, Inc.*, 304 Ark. 451, 803 S.W.2d 888 (1991).

Affirmed on condition of remittitur.

CORBIN, J., not participating.