**GREAT AMERICAN INSURANCE COMPANY and the Ohio Casualty Insurance Company, d/b/a the Ohio Casualty Group Plaintiffs**

v.

**DOVER & DIXON, P.A.; M. Darren O'Quinn; and David A. Couch Defendants**

No. 4:04–CV–00582GTE.

United States District Court, E.D. Arkansas, Western Division.

Oct. 13, 2005.

Kent J. Rubens, Rieves, Rubens & May-
ton, West Memphis, AR, Leonard Bazelak,
Neil F. Freund, Vaseem S. Hadi, Freund,
Freeze & Arnold, Dayton, OH, Michael R.
Mayton, Rieves, Rubens & Mayton, Little
Rock, AR, for Plaintiffs.

Nate Coulter, Wilson, Engstrom, Corum
& Coulter, Little Rock, AR, for Defen-
dants.

**1.** The summary judgment record also in-
cludes other submissions by the parties, in-
cluding Plaintiffs' designations to deposition
transcripts and expert reports, and additional
briefing by both Plaintiffs and Defendants.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

Before the Court is Defendants' Motion
for Summary Judgment, to which Plain-
tiffs have responded.[1] For the reasons
stated below and following a thorough re-
view of the summary judgment record in
this case, the Court concludes that the
Defendants are entitled to judgment as a
matter of law.

## OVERVIEW

This legal malpractice case arises from a
$78,000,000 verdict[2] rendered on June 22,
2001, in Polk County Circuit Court for the
negligent care and wrongful death of Mar-
garetha Sauer. Ms. Sauer resided at the
Rich Mountain Nursing and Rehabilitation
Center (hereinafter, "the Rich Mountain
nursing home") for several years prior to
her death on July 12, 1998. The *Sauer*
Judgment was later affirmed by the Ar-
kansas Supreme Court upon the condition
of remittitur of the verdict to $26,000,000.
*Advocat, Inc. v. Sauer*, 353 Ark. 29, 111
S.W.3d 346 (2003), *cert. denied*, 540 U.S.
1004, 124 S.Ct. 535, 157 L.Ed.2d 409
(2003). Hereinafter, the Court's use of the
phrase "the *Sauer* case" refers to the state
court lawsuit filed by Ms. Sauer's estate,
defended by Little Rock attorneys Darren
O'Quinn and David Couch, and resulting in
a $26,000,000 Judgment, a portion of which
was paid by the Plaintiffs Great American
Insurance Company and/or The Ohio Ca-
sualty Group[3] in their capacity as excess
insurance carriers for Advocat Inc.

**2.** The verdict included $63,000,000 in puni-
tive damages. Upon information and belief,
this is the largest nursing home verdict in
Arkansas history.

**3.** Although Ohio Casualty never issued a poli-
cy to Advocat, in December of 1998 Ohio

Advocat, Inc., along with its subsidiaries Diversicare Management Services Company and Diversicare Leasing Corporation d/b/a Rich Mountain Nursing and Rehabilitation Center, operated the Rich Mountain nursing home.[4] Advocat, through Caronia Corporation, its third-party administrator, hired Darren O'Quinn and David Couch, attorneys with the Little Rock law firm of Dover & Dixon, to defend the *Sauer* case.

The Complaint before this Court was filed on June 17, 2004, by Plaintiffs Advocat, Inc. and Great American Insurance Company against Defendants M. Darren O'Quinn, David Couch, and the law firm, Dover & Dixon. On July 1, 2004, Advocat filed a Rule 41(a)(1)(i) Notice of Dismissal. On the same date, Plaintiff Great American filed a motion, therein noting that Advocat had been named as a party "as a result of miscommunication and consequent misunderstandings." On July 6, 2004, Plaintiff Great American amended its Complaint to add Ohio Casualty as a party. On September 20, 2004, Plaintiffs amended their Complaint again, for the purpose of substituting Defendant Dover & Dixon, P.A. in place of "Dover, Dixon, Horne, P.L.L.C."

Plaintiffs contend in this diversity jurisdiction federal lawsuit that the Defendant attorneys were negligent and/or reckless in their state court representation of Advocat, as a result of which Plaintiffs were forced to pay approximately $10,000,000 toward satisfaction of the *Sauer* Judgment.

The Defendant attorneys seek summary judgment, contending that Ohio Casualty's lawsuit is barred by Arkansas law based on the lack of privity of contract between the Defendants, as the lawyers retained by Advocat, and Ohio Casualty, which provided excess insurance coverage to Advocat.[5] With two limited exceptions, Arkansas law imposes a statutory requirement of privity of contract as a prerequisite to imposing liability on a lawyer for negligent acts or omissions in connection with providing professional services. Ark.Code Ann. § 16–22–310 (2005 Supp.).

While Plaintiffs' allegations of negligence are broad indeed, running the gamut from alleged pre-trial communication failures to failing to propose appropriate jury instructions—and everything in between—it is unnecessary to consider any acts of negligence except those which bear upon the threshold question of whether Defendants are entitled to the protection of Arkansas' direct privity statute.[6] For summary judgment purposes, the material negligence allegations relate to the extent and nature of the relationship between Plaintiffs, as excess umbrella carriers for Advocat, and Defendants, which Advocat retained directly, because the statute's ap-

Casualty purchased Great American's Commercial Division, thereby assuming responsibility for the excess umbrella policy Great American had issued to Advocat. For the purposes of the Court's ruling herein, it is unnecessary to distinguish between Great American and Ohio Casualty or to explore the nature of their contractual relationship. Accordingly, throughout this Opinion, the terms "Plaintiffs", "Great American" and "Ohio Casualty" are used interchangeably.

4. Unless otherwise noted, the Court will use the term Advocat generally to refer to Advocat and its subsidiaries.

5. This ruling makes it unnecessary to address the Defendants' separate contention that Ohio Casualty's claim is time barred. Ohio Casualty was not named as a party until the filing of the First Amended Complaint, arguably beyond the three-year statute of limitations applicable to such claims.

6. Thus, the entire trial transcript of the *Sauer* case tendered by Plaintiffs, while interesting, is not material summary judgment record evidence.

plicability turns on the nature of the relationship between those parties.

■ Finally, although the privity issue before the Court is typically framed by Arkansas courts as an issue of standing, the question arises whether the issue might also be viewed as an issue of legal duty.[7] The same threshold question arises in any negligence case—does the defendant owe any legal duty to the plaintiff. Without a legal duty owed, of course, there can be no corresponding negligence. The question of whether a duty is owed is always a question of law and never one of fact for the jury. *Bryant v. Putnam,* 322 Ark. 284, 908 S.W.2d 338 (1995); *Jordan v. Jerry D. Sweetser, Inc.,* 64 Ark.App. 58, 977 S.W.2d 244 (1998).

In any event, this Court also views Arkansas' privity statute, in effect, as an expression by the Arkansas legislature of the limited circumstances in which a duty of care may be imposed on an attorney, in connection with professional services rendered, to anyone other than the client who hired him.

## FACTS WITHOUT MATERIAL CONTROVERSY

For the year 1998, Plaintiffs Great American and/or Ohio Casualty issued to Advocat an excess umbrella policy providing for $45 million in coverage. The coverage provided by Plaintiffs was the top layer of coverage over and above the following coverage amounts:

(1) Advocat's Self–Insured Retention ("SIR") of $300,000;

(2) Admiral Insurance Company—primary coverage of $1,000,000;

(3) Gulf Insurance Company—lead umbrella carrier—$5,000,000.

On January 26, 2000, Janie Hanna of Caronia Corporation, a third-party administrator for Advocat, hired Darren O'Quinn of the firm Dover & Dixon to represent Advocat's interests in the *Sauer* case.[8] Mr. O'Quinn was assisted by Dover & Dixon colleague David Couch. It is undisputed that Plaintiffs did not hire the Defendant lawyers or the law firm for which they worked. It is further clear from the record evidence that no direct contractual relationship was ever established between Plaintiffs—Advocat's secondary excess carrier—and the attorneys selected by Advocat to represent their interests in the *Sauer* case. Mr. Danehy, Plaintiffs' designated Fed.R.Civ.P. 30(b)(6) deponent, candidly testified that at no time did the Plaintiffs establish an attorney-client relationship with Mr. Couch, Mr. O'Quinn, or with any lawyer at Dover & Dixon.[9]

---

7. At least one prominent commentator has questioned the usefulness of the standing doctrine altogether, noting that the issue should simply be a question on the merits of the plaintiff's claim. As that commentator noted, "The essence of a true standing question is the following: Does the plaintiff have a legal right to judicial enforcement of an asserted legal duty? This question should be seen as a question of substantive law, ..." William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 223 (1988). Describing the issue here as one of determining whether any legal duty is owed, rather than falling back on the nebulous notion of "standing," might well be more precise. In any event, regardless of the label, the conclusion is the same.

8. Advocat applied some of its $300,000 SIR to pay Dover & Dixon for legal fees and expenses incurred in defending the case.

9. Mr. Danehy testified:
   Q. Okay. Is it your claim that at any time you had an attorney/client relationship with Couch or O'Quinn—
   A. [Danehy]. No.
   Q. - or with anybody at Dover and Dixon?
   A. [Danehy]. No.
   Q. Okay. As a matter of fact, before the jury verdict came down, you hadn't actually hired any lawyer or developed an attorney/client relationship with any lawyer with regard to the Sauer litigation, is that correct?

Plaintiff Ohio Casualty did not even learn of the *Sauer* case until approximately May 11, 2001, one-month prior to the beginning of the *Sauer* trial. The Defendant attorneys had no contact with Plaintiffs until May of 2001, when Caronia asked Defendant O'Quinn to send his pre-trial report, along with other recently prepared reports, to James Danehy with Plaintiff The Ohio Casualty Group. Defendant O'Quinn complied. His two paragraph letter dated May 23, 2001, to Plaintiffs' James Danehy reads in its entirety:

Dear Mr. Danehy:

As instructed by Janie Hanna at Caronia Corporation, I am enclosing to you copies of recent correspondence and my pre-trial report in connection with the referenced matter.

If you have any questions, please do not hesitate to call me.

Very truly yours,

DOVER & DIXON, P.A.

M. Darren O'Quinn

Defendant O'Quinn's pre-trial report estimated the potential jury verdict in the *Sauer* case at between $400,000 and $600,000 in compensatory damages and $1,800,000 in punitive damages.[10]

A. [Daney]. That's correct.
(Danehy deposition, at p. 124, Exh. G to Def.'s motion).

10. Mr. O'Quinn had previously issued copies of this report directly to Advocat's other insurance carriers, also at Caronia's request.

11. Most importantly, even if Mr. O'Quinn had known of such an offer, that would not create a duty on his part or direct privity under the totality of the circumstances in this case, as revealed by the summary judgment record. In that sense, the factual dispute regarding the alleged $2.5 million settlement offer, whether it existed, and whether the Defendants knew or should have known about same is immaterial.

Many of the allegations of negligence concern allegations that Defendants failed to discover and communicate certain settlement offers in the *Sauer* lawsuit to Ohio Casualty's representative, James Danehy. On or about June 6, 2001, Darren O'Quinn wrote a letter to Brian Reddick, an attorney with the law firm Wilkes & McHugh and one of the *Sauer* Estate's lawyers, extending a settlement offer of $500,000. This offer was promptly rejected, but a counter-offer of $4,500,000 was extended to Advocat by the *Sauer* Estate. Plaintiffs contend that the Defendant O'Quinn's June 6th letter simultaneously rejected a $2.5 million demand that the *Sauer* Estate had issued earlier that same day. Plaintiffs suggest that, had they known of such an offer, they (or Advocat) would have insisted that the case be settled for that amount.

There is no evidence that Defendant O'Quinn knew about the alleged $2.5 million offer.[11] Rather, it appears such an offer, to the extent it existed, occurred in the context of settlement negotiations occurring between the Sauer's lawyer and representatives of insurers Gulf and/or Admiral, negotiations in which Defendants did not participate.[12]

12. It is not uncommon, particularly where there are competing layers of insurance coverage, for settlement negotiations to occur directly between insurers responsible for paying a judgment and plaintiff's lawyers without knowledge or involvement of the insured or their attorneys. Such has been acknowledged in this case by Advocat's Bob Rice, who, when asked whether insurance carriers on occasion may attempt to settle a case without their insured's knowledge, responded, "absolutely." (Rice deposition at p. 95, Exhibit I to Def.'s Motion). Mr. Rice further testified that he was unaware of a $2.5 million demand and he lacked any knowledge that Mr. O'Quinn was ever aware of such an offer. (Rice depo. at p. 59, Exhibit D to Def.'s First Reply Brief).

On June 11, 2001, the *Sauer* trial began in Polk County. Insurance carrier Gulf retained its own attorney, Victor Hlavinka, to monitor the entire trial for Gulf. Insurance carrier Admiral retained its own attorney, Patricia Harris, to monitor a portion of the *Sauer* trial for Admiral. Plaintiff Ohio Casualty assigned claims manager James Danehy to the *Sauer* case. Mr. Danehy consulted with Little Rock attorney Bruce Munson, but did not hire him to monitor the trial. Plaintiffs assert that they relied upon the Defendants for advice, counsel and status updates throughout the *Sauer* trial.

During the trial, on June 21, 2001, Admiral offered up the limits of its $1 million policy. Thereafter, Gulf, through its reinsurer's manager David Dolph, extended an additional $1.5 million settlement offer (for a total of $2.5 million) by telephone directly to the attorney for the *Sauer* Estate. In response, Jim Wilkes, one of the *Sauer* attorneys, telephoned Mr. Dolph, lowering the *Sauer's* settlement demand from $4.5 million to $4.25 million. All of these discussions occurred on June 21, 2001, prior to the jury's verdict. No further negotiations occurred prior to the jury's verdict.

On June 22, 2001, the jury returned a plaintiff's verdict in excess of $78 million.[13] Plaintiffs ultimately paid $9,994,800 toward the reduced *Sauer* verdict.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the Court must view all facts and inferences from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548. However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. Rule 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

---

**13.** Plaintiffs contend that the Defendants' made numerous errors at trial which caused Advocat to lose the *Sauer* case and hampered any chance of reversal on appeal. It is premature to consider the issue of whether the Defendants were negligent in their representation of Advocat or the Plaintiffs. In opposing summary judgment, Plaintiffs have submitted their expert reports and the entire *Sauer* trial transcript. However, the Court considers such submissions solely to the extent they bear upon the statutory immunity, privity and duty issues before the Court.

## DISCUSSION

At the outset, it is important to consider carefully the specific issue presented in this case. This case does not involve the issue of whether an insurer that retains a law firm to represent its insured may pursue a legal malpractice action against the firm. As a district court, interpreting Virginia law, recently noted, "nearly all jurisdictions in the United States permit some form of legal malpractice action by an insurer against the firm it retains to defend an insured." *General Sec. Ins. Co. v. Jordan, Coyne & Savits, LLP*, 357 F.Supp.2d 951, 956–57 (E.D.Va.2005). This issue is not before the Court in this case.[14]

Rather, the issue here is whether excess insurers may pursue legal malpractice claims against the attorneys who represented their insured. Most courts have denied such claims. *See, e.g., Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103 (2d Cir.1991); *Essex Ins. Co. v. Tyler*, 309 F.Supp.2d 1270 (D.Colo.2004); *See also Nat'l Union Fire Ins. Co. v. Salter*, 717 So.2d 141 (Fla. 5th DCA 1998)(rejecting on public policy grounds the subrogation of such legal malpractice claims).

As a threshold issue, this Court must determine whether the Defendants are entitled to statutory immunity from the legal malpractice claims brought by Plaintiffs. As interpreted by Arkansas' highest court, Ark.Code Ann. § 16–22–310 (Repl.1999) requires "the plaintiff to have direct privity of contract with the person, partnership, or corporation he or she is suing for legal malpractice." *Giles v. Harrington, Miller, Neihouse & Krug*, — S.W.3d ——, 2005 WL 1120238, slip op. at p. 4 (Ark. May 12, 2005)(citing four cases). The statute provides for two exceptions to this direct privity requirement, one for fraud or intentional misrepresentations and a second for third-parties that the law firm's actual client intends to benefit from such legal services and which third-parties are identified in a writing by the lawyer or firm charged with legal malpractice.

In opposing summary judgment, Plaintiffs contend that they have standing under § 16–22–310's general "privity rule" as well as under both "privity rule" exceptions. Plaintiffs additionally contend that their claims should be allowed under equitable subrogation principles. Each of these four arguments will be considered separately below.

1. ***Arkansas' Privity Statute, Ark Code Ann. § 16–22–310***

The statute in question, Ark.Code Ann. § 16–22–310 (Repl.1999), provides in pertinent part:

(a) No person licensed to practice law in Arkansas and no partnership or corporation of Arkansas licensed attorneys or any of its employees, partners, members, officers, or shareholders shall be liable to persons not in privity of contract with the person, partnership, or corporation for civil damages resulting from acts, omissions, decisions, or other conduct in connection with professional services performed by the person, partnership, or corporation, except for:

(1) Acts, omissions, decisions, or conduct that constitutes fraud or intentional misrepresentations; or

(2) (A) Other acts, omissions, decisions, or conduct if the person, partnership, or corporation was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action.

14. Apparently, this issue has not been addressed by the Arkansas Supreme Court.

(B) For the purposes of subdivision (a)(2)(A) of this section, if the person, partnership, or corporation identifies in writing to the client those persons who are intended to rely on the services and sends a copy of the writing or similar statement to those persons identified in the writing or statement, then the person, partnership, or corporation or any of its employees, partners, members, officers, or shareholders may be liable only to the persons intended to so rely, in addition to those persons in privity of contract with the person, partnership or corporation.

.   .   .   .   .

## 2. *There was no direct privity between the parties*

■ With regard to the statutory privity requirement, Arkansas' highest court has determined that "the language of this section is precise and clear and reveals that the contract contemplated by the statute relates to a contract for professional services performed by the attorney for the client." *Clark v. Ridgeway,* 323 Ark. 378, 386, 914 S.W.2d 745, 749 (1996).

■ At best, Plaintiffs' allegation that "Plaintiff American was in privity of contract with Advocat and, as a privity, was owed a duty by Defendants to adequately and competently represent Advocat in the Sauer litigation"[15] asserts a claim of indirect privity. Indirect privity is insufficient to satisfy the statutory privity requirement. *See McDonald v. Pettus,* 337 Ark. 265, 271–272, 988 S.W.2d 9 (1999)(rejecting

argument by children that privity with father's attorney existed because children were in privity with their father who was in privity with the attorney); *Jackson v. Ivory,* 353 Ark. 847, 858, 120 S.W.3d 587 (2003)(rejecting plaintiff's argument that because he was involved with the limited liability company which hired the lawyer, that the plaintiff could "stand in the shoes of the LLC" and sue the lawyer).

Finally, under Arkansas law, the direct privity finding required under 16–22–310(a)(1) is narrower than an attorney-client relationship. "A plaintiff may not substitute an 'attorney-client relationship requirement' for the privity requirement." *Jackson,* 353 Ark. at 858, 120 S.W.3d at 594. In other words, a party may establish an attorney-client relationship and still lack the direct privity required for the imposition of liability on an attorney for legal malpractice. Direct privity may not be established, however, in the absence of an attorney-client relationship. This point is important, and frequently lost on the Plaintiffs in this case, whose arguments seem to suggest that an attorney-client relationship suffices to create direct privity.[16] Not so.

Plaintiffs assert that while Advocat was the Defendants' "officially identified client," the Defendants also owed an "ethical, corresponding duty towards the carriers." (Pl.'s Brief at pp. 29–30). Defendants' duty to them arose, at the latest, Plaintiffs contend, in May of 2001, "when the defendants began rendering legal advice and counsel to Ohio Casualty upon

---

15. (Second Amended Complaint, ¶ 14).

16. For example, Plaintiffs' expert Tim Dudley first opines that "Advocate [sic] essentially directed the establishment of an attorney-client relationship by directing O'Quinn to submit reports and report to the excess insur-

ers" and then proceeds to discuss how attorneys O'Quinn and Couch breached the standard of care by failing to communicate all settlement offers to the insurers. Such analysis lacks an essential step—the requirement of direct privity.

Caronia's specific request." (Pl.'s brief at p. 29).

There is no evidence that the Defendants ever attempted to provide legal advice and counsel to the Plaintiffs. That the Defendants followed their client's instruction and provided Plaintiffs with copies of all correspondence, routine reports and case evaluations did not establish an attorney-client relationship or create any legal or ethical duties owed to Plaintiffs. Most importantly, such conduct did not establish the required direct privity between Great American and Ohio Casualty and the defendant lawyers. There is no evidence that Defendants O'Quinn, Couch, or Dover & Dixon ever agreed or contracted to provide legal services on behalf of Great American or Ohio Casualty.

Mr. O'Quinn's two-sentence transmittal letter, written on May 23, 2001 [17] shortly before the Sauer trial began, make it clear that he is acting at the instruction of Caronia. In no way does the letter indicate an intent to provide legal services to the Plaintiffs, to establish a contractual relationship with them, or to look out for their specific (and unique) legal interests. The Court holds as a matter of law that the Defendants' actions in sending reports and copies of correspondence, at the request of their client, to the Plaintiffs did not establish any sort of direct privity or create any legal or ethical duties.

Plaintiffs further contend they relied upon the Defendant attorneys' valuation of the Sauer case in deciding that the damage award, if any, was unlikely to rise to their level of coverage, an assumption which no doubt influenced their approach to the Sauer case, including the decision not to retain counsel to monitor the trial. Indeed, it may be that Plaintiffs relied on the Defendants and their evaluation of the Sauer case. Plaintiffs elected to do so, however, at their own peril. Plaintiffs had an opportunity to retain independent counsel to protect their interests and to provide an independent assessment of the Sauer case. They elected not to do. Plaintiffs' unilateral, independent, arms-length decision to rely upon advice rendered to Advocat by the Defendants would not create an attorney-client relationship or the statutorily required direct privity.

Plaintiffs further suggest that the Defendants failed to discover that the Sauer plaintiffs, had indicated a willingness to settle for $2.5 million during the June 6th settlement discussions directly with representatives for Admiral and Gulf, Advocat's other insurance carriers. Under Plaintiffs' theory, Defendants should have taken the extra step of injecting themselves into the settlement negotiations conducted directly between counsel for the Sauers and Advocat carriers Gulf and Admiral, whereby they might have learned of the alleged $2,500,000 offer, extended by the Sauers' counsel (assuming such an offer ever existed) and then would have been obligated to take the extra step of communicating that offer to Ohio Casualty.[18] Again, this cir-

---

**17.** It is notable that Plaintiffs did not even learn of the Sauer lawsuit and the potential for exposure until May 11, 2001, exactly one month before the Sauer trial began. Plaintiffs' notice of the claim came in a notification letter sent by Caronia. In fact, according to an expert report submitted by Plaintiffs, "Great American was only put on notice as a result of a mistaken belief by Caronia that Gulf's layer of insurance had been exhausted." (Plaintiff's expert Bruce Campbell's let-

ter of August 15, 2005, at p. 9, n. 10). There is no indication that Great American elected to dispute whether the notice received from its insured was adequate or that it—or Ohio Casualty—otherwise attempted to dispute the claim vis-a-vis their insured.

**18.** That insurance carriers Gulf and Admiral's lawyers were attempting themselves to settle the Sauer case directly underscores the point that the 3 separate insurance carriers for Ad-

cumstance does not create any privity relationship between Plaintiffs and Advocat's lawyers. Even assuming, *arguendo* (and the record evidence would not support such a finding), that the Defendants learned that an offer to resolve the Sauer lawsuit for $2,500,000 had been extended, the Defendants owed no duty to the Plaintiffs to make sure they knew about the offer. The Plaintiffs were on notice of the lawsuit, notice of their potential liability and obligated to determine for themselves their exposure and to participate, if they determined it in their best interest to do so, in settlement negotiations.

Finally, Plaintiffs offer the testimony of two proposed experts—attorneys Tim Dudley and Bruce Campbell—both of whom opine that an attorney-client relationship existed between Plaintiffs and Defendants.[19] This Court doesn't require or permit so-called "legal experts" to advise it on legal issues. To the extent Plaintiffs' proffer "expert opinions" on the ultimate legal issue before this Court, the Court rejects their legal conclusions. *See, e.g., Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir.2003)("expert testimony on legal matters is not admissible"; "matters of law are for the trial judge.").

The Court has no hesitation in concluding that the Defendants, Dover & Dixon, Darren O'Quinn, and David Couch were not in direct privity with Plaintiffs Great American or Ohio Casualty.

### 3. The "intentional misrepresentation" privity exception does not apply.

Excepted from Arkansas' privity requirement are "acts, omissions, decisions, or conduct that constitutes fraud or intentional misrepresentations." Ark.Code Ann. § 16–22–310(a)(1). Undaunted by the fact that their Second Amended Complaint fails to allege any fraud or misrepresentation on the part of the Defendants, Plaintiffs assert that this exception applies and permits the present lawsuit even in the absence of direct privity.

■ For this proposition, Plaintiffs again rely upon the Defendants' alleged failure to discover and to communicate to Ohio Casualty and Advocat an alleged $2.5 million offer to resolve the Sauer lawsuit. Again, the evidence before the Court would not permit any reasonable fact-finder to conclude that the Defendants actually learned that an offer to settle the *Sauer* case for $2.5 million had been extended. Nor does the Plaintiffs' allegation that "regardless of whether O'Quinn had actual knowledge, the standard of care mandates an attorney should be aware of all settlement negotiations that may affect his case" (at p. 23 of Plaintiff's Brief) suffice to

---

vocat all had potentially conflicting interests. To expect the Defendants, as trial lawyers retained to represent Advocat in a nursing home neglect case, to undertake to represent the competing interests of all of ·Advocat's carriers (while preparing for trial), is unreasonable, contrary to notions of fundamental fairness, and, at odds with Arkansas' statutory privity requirement.

19. In the expert reports, copies of which were tendered to this Court (but don't appear to be filed of record), proposed expert Tim Dudley opines that an attorney-client relationship was created because the reports Mr. O'Quinn submitted to the excess carriers were marked "attorney-client privilege," contending that this constituted an acknowledgment on Mr. O'Quinn's part that he represented the excess carriers. Mr. Dudley further opines that Advocat "essentially directed the establishment of an attorney-client relationship by directing O'Quinn to submit reports and report to the excess insurers." The Court rejects the notion that an attorney-client relationship is created anytime an attorney sends privileged documents to a third-party at his client's request.

create an issue as to fraud or intentional misrepresentation.

■ On the issue of what a plaintiff must prove to take advantage of this exception, the Arkansas Supreme Court recently stated:

To establish fraud, a plaintiff must show: (1) a false representation of material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance.

*Fleming v. Cox Law Firm,* —— S.W.3d ——, 2005 WL 1485216 (Ark. June 23, 2005).

Plaintiffs have failed to come forward with any evidence that the Defendants made any affirmative misrepresentations in an effort to induce action or inaction by the Plaintiffs. Further, the record is devoid of anything to suggest that the Defendants made representations that they knew or should have known were false at the time they were made. Of course, "a promise or averment cannot be made false by subsequent events and still fall under the umbrella of intentional fraud unless the party making the promise knew it would not be kept at the time of the promise." *Clark, supra,* 323 Ark. at 388, 914 S.W.2d 745 (citations omitted). The suggestion that the Defendant attorneys committed fraud appears, on this record, frivolous, and the Court questions whether the Plaintiffs exercised their Rule 11 duties to ensure that such allegations had at least some evidentiary support. *See* Fed. R.Civ.P. 11(b)(3).

May Plaintiffs rely on a theory of fraudulent concealment to come within the fraud exception to the direct privity requirement? Even assuming that Arkansas would recognize fraudulent concealment to be sufficient to dispense with the privity requirement, the facts here do not even rise to the level of fraudulent concealment.

Before imposing a duty to disclose, courts generally require a special relationship between the party who should have disclosed a fact and the victim of the failure to disclose. With respect to when a duty to speak arises, the Arkansas Supreme Court has stated, "[t]he duty of disclosure arises where one person is in [a] position to have and to exercise influence over another who reposes confidence in him whether a fiduciary relationship in the strict sense of the term exists between them or not." *Hanson Motor Co. v. Young,* 223 Ark. 191, 265 S.W.2d 501 (1954) (citation omitted). *See also Union National Bank of Little Rock v. Farmers Bank, Hamburg, Arkansas,* 786 F.2d 881, 887 (8th Cir.1986)("Under Arkansas law, a party may have an obligation to speak rather than remain silent, when a failure to speak is the equivalent of fraudulent concealment") (citations omitted).

In a 2003 Arkansas case, mortgagors sued their mortgagee, a bank, contending that the bank owed them a duty to inform them that the amount tendered to cure their default was insufficient and to provide them with the correct amount to cure the default. In rejecting this argument, the court noted:

The general rule is to the contrary, and ordinarily, absent affirmative fraud, a party, in order to hold another liable in fraud must seek out the information he desires and may not omit inquiry and examination and then complain that the other did not volunteer information. *See Ward v. Worthen Bank & Trust Co.,* 284 Ark. 355, 681 S.W.2d 365 (1984), (*quoting Berkeley Pump Co. v. Reed–Joseph Land Co.,* 279 Ark. 384, 653 S.W.2d 128 (1983)).

*Lambert v. Firstar Bank, N.A.,* 83 Ark. App. 259, 264, 127 S.W.3d 523, 527 (2003); *See also, Union Nat. Bank of Little Rock v. Farmers Bank, Hamburg,* 786 F.2d 881, 887 (8th Cir.1986)(applying Arkansas law).

Here, Ohio Casualty's James Danehy undertook to determine the value of the *Sauer* case and Ohio Casualty's exposure. Mr. Danehy was in a position equal (if not better) than Defendants (who were preparing for the trial scheduled to begin 5 days later at this point) to inquire of Advocat's other insurers and to participate in settlement discussions. Had Mr. Danehy, on Ohio Casualty's behalf, desired additional information concerning the negotiations leading up to Mr. O'Quinn's June 6th counter-offer, he could have inquired. The Court concludes under these circumstances that the Defendants had no duty to inquire and no duty to Ohio Casualty (or Great American) with regard to the settlement negotiations in which insurers Gulf and Admiral participated, but Ohio Casualty did not.

In sum, the facts relied upon by Plaintiffs do not support a theory based on fraud, misrepresentation, or fraudulent concealment (even assuming such would qualify as fraud sufficient to dispense with the privity requirement).

### 4. The "primary intent of the client" third-party beneficiaries privity exception does not apply.

In order to trigger the second exception to Arkansas' direct privity statute, a defendant lawyer must have identified in writing those third parties intended to rely on the lawyer's services and this writing must have been sent to both the lawyer's client and the third parties. Ark.Code Ann. §§ 16–22–310(a)(2)(A) and (B).

Once again, Plaintiffs rely upon Darren O'Quinn's transmittal letter of May 23, 2001, set forth in its entirety *supra*, contending that it satisfies the writing requirement for application of this exception. Plaintiffs are mistaken. The letter is nothing more than a cover letter to accompany the correspondence and reports that the Defendants were directed by their client, Advocat, to provide to James Danehy with Plaintiff Ohio Casualty.[20] This cover letter lacks the required expression of intent to provide legal services for the benefit of Ohio Casualty or Great American.[21]

Arkansas' highest court construed this provision in *Jackson v. Ivory, supra,* 353 Ark. 847, 120 S.W.3d 587 (2003), rejecting an argument that the particular writing at issue triggered the written instrument exception to the immunity statute. In so holding the Court stressed that there was nothing in the writing which indicated that Jackson, a party to the agreement, should rely upon the lawyer who drafted it for professional services. *Jackson,* 353 Ark. at 860–61, 120 S.W.3d 587. Similarly, in Mr. O'Quinn's cover letter, there is no language to indicate that either Danehy or

---

20. That Advocat shared with its carriers, including Ohio Casualty, pretrial reports and information regarding the valuation of the *Sauer* case prepared by its counsel is understandable given the duty of cooperation it owed to its carriers.

21. Moreover, Plaintiffs' assertion, in their opening summary judgment brief at p. 36, that "Caronia requested the defendants advise and communicate directly with Ohio Casualty about the *Sauer* case" is misleading. Excerpts from the deposition of Caronia's Janie Hanna provided by Defendants indicate that Ms. Hanna "asked Darren [O'Quinn] to send reports and stuff like that to Mr. Danehy to assist him in forming his own evaluation of the case" but she did not ask Mr. O'Quinn to "advise" Danehy. (Defs' Reply, Exh. B, Hanna depo. at 62).

his employer, Ohio Casualty, should rely on Mr. O'Quinn, Mr. Couch, or any other attorney at Dover & Dixon for professional services.

The May 23rd cover letter relied upon by Plaintiffs does not trigger the application of the second statutory exception to the direct privity requirement. Nor is there anything else in the record to permit the application of this exception.

### 5. *Plaintiffs may not rely upon equitable subrogation principles to avoid Arkansas' statutory privity requirement.*

■ Plaintiffs alternatively argue that they have the right to be equitably subrogated to any alleged malpractice claim against Advocat's attorney. Arkansas courts have not addressed the issue of whether an excess insurer has a right to equitable subrogation with respect to its insured's legal malpractice claim against its defense attorney. This Court predicts that the Arkansas Supreme Court, if presented with this issue, would answer the question with a clear "no."

■ Arkansas law no longer distinguishes between equitable (or legal) subrogation (which arises by application of principles of equity) and conventional subrogation (which arises from contract or the acts of the parties). *See Franklin v. Healthsource of Arkansas,* 328 Ark. 163, 167, 942 S.W.2d 837 (1997)("[t]he same facts give rise to both legal and conventional subrogation."); *Southern Farm Bureau Cas. Ins. Co. v. Tallant,* —— S.W.3d ——, 2005 WL 914615 (Ark.2005).

The cases relied upon by Plaintiffs in support of permitting an equitable subrogation claim here are distinguishable. Jurisdictions permitting such claims lack statutes similar to the one enacted in Arkansas. Further, even if other jurisdictions with similar privity requiring statutes

permitting equitable subrogation claims existed, this Court would still predict, based upon the Arkansas case law in this area, that the Arkansas Supreme Court would refuse to recognize such claims.

The effect of allowing such suits would be to severely undercut Arkansas' statute limiting legal malpractice claims. The Arkansas Supreme Court has held that § 16–22–310 "enunciates the parameters for litigation by clients against attorneys." *Clark, supra,* 323 Ark. at 388, 914 S.W.2d at 750. Allowing equitable subrogation suits would severely undercut the Arkansas legislature's determination of when an attorney should face potential liability for professional negligence.

Additionally, allowing equitable subrogation claims in this context would, in essence, be founded on an assignment of the insured's tort claim against its attorneys to the insurer which paid a portion of the insured's claim. Arguably, Arkansas law does not permit the assignment of tort claims. *See Midwest Mutual Insurance Co. v. Arkansas National Co.,* 260 Ark. 352, 538 S.W.2d 574 (1976)(holding that an insured could not assign its unliquidated tort claim).

In *National Union Fire Ins. Co. v. Salter, supra,* 717 So.2d 141 (1998), a Florida court rejected the argument that an insurer, by virtue of the fact that it paid an insured's claim, was subrogated to the insured's right to recover from its attorneys. The court noted that legal malpractice claims are personal torts "which cannot be assigned because of the personal nature of the legal services which involve highly confidential relationships." *Id.,* at 142. This Court predicts that the Arkansas Supreme Court, if confronted with the issue, would find that legal malpractice claims are personal to the client and non-assignable to third-parties.

For both of these reasons, the Court rejects Plaintiffs' contention that it is entitled to pursue its insured's legal malpractice claims against the Defendants attorneys based upon a theory of equitable subrogation.

## CONCLUSION

Everyone was shocked by the jury's verdict in the *Sauer* case. Plaintiff Ohio Casualty and Great American took their surprise and disappointment a step further than either Advocat or its other insurance carriers, and filed this federal lawsuit in an effort to recover their losses from the lawyers Advocat retained to represent it in the *Sauer* case. Plaintiffs' theory of recovery is flawed. The Defendant lawyers in this case owed no duty of care to the Plaintiffs. The Defendants were retained by Advocat to represent Advocat's legal interests, not those of Advocat's excess carrier. Plaintiffs lack standing to pursue these claims based upon the lack of direct privity with the Defendant lawyers. The Defendants are entitled to the full protection of Ark.Code Ann. § 16–22–310.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Docket No.50) be, and it is hereby, GRANTED. A separate Judgment is being entered simultaneously herewith.