Brandon J. Harrison, Judge, concurring and dissenting. I agree with all of my colleagues’ decisions that the outrage claim and the related damages verdict and judgment must b,e reversed and dismissed. I also agree with the majority that substantial evidence supports the jury’s verdict on the malicious-prosecution claim. |«J respectfully dissent, however, on the amount of money the jury awarded on that' claim. A $2.75 million aggregate award in favor of Jimmy Huff and Robert Ward is shockingly excessive and should be significantly reduced. The jury decided that these men were damaged by Family Dollar’s actions. But even viewing the evidence in the light most favorable to Huff and Ward, the record buckles under the weight of the judgment. Let’s begin with the arrests. Chet Dunlap, Huff and Ward’s criminal defense attorney, testified that he allowed Huff to go to the West Memphis Police Department to speak with Detective Galtelli on a Friday afternoon, believing he would not be arrested, because Dunlap did not believe Huff had done anything wrong. ■ Huff testified that, after he was arrested around 4:30 p.m. that Friday afternoon, he sat in the back of a car, was transported to jail, fingerprinted, booked, and photographed. Attorney Dunlap said he was “shocked” when Huff was arrested and called a circuit judge he had known for a long time and asked the judge to set a bond. The circuit judge did so. As a result, Dunlap successfully prevented Huff from having to stay in jail over the weekend. Huff still said the experience made him feel “like, a thief and a criminal.” Ward was not quite as fortunate;- he spent about an hour in jail after being arrested and held in the “holding tank” and was also fingerprinted and photographed. Ward said he. felt “abused.” Neither man had a prior .criminal history. Here is more about Ward and Huff as gleaned from the trial testimony. Ward, 59, started with Family Dollar in 1998, as a' Class C Mechanic. He worked second shift in the truck shop and repaired storage trailers; We have no information on the money- he was making at Family Dollar when his employment was terminated. We have no | ^information on any eniployment-related benefits he was receiving or may have been entitled to receive. We have no information about his work-performance history with Family Dollar and whether he could have reasonably expected to continue working for Family Dollar for any number of years to come. Ward did not mention the scarcity of jobs in the region where he.lived. He did say that the turmoil “caused me a lot of sleepless nights and a lot of knots in my stomach. It’s been a really bad few years.” Huff testified that he started with Family Dollar in September 1996 as a Class B Mechanic and began the maintenance shop/inspection process for the company. He also said that Family Dollar-fired him right before Christmas, and his four-year-old daughter “wants everything' at Wal-márt wé look at, and I ain’t got a job, couldn’t draw unemployment, couldn’t go to work anywhere ’cause a felony was [pending].” And Huff explained that his mother mortgaged her ■ house a second time and loaned him $10,000. Another friend, said Huff, gave him $10,000 and told Huff to pay him back whenever he could. Huff also told the jury about the difficulty in finding a job comparable to the one-he enjoyed at Family Dollar. “[I]t’s hard to find a job that you like that you enjoy doing ... I kind of fit the job and my job kind of fit me.” And he explained that there were not many places to find a-job that, back in 2006, paid $22.50 an hour for a 40-hour week, 52 weeks a year.. Huff took pride in the work he did for Family Dollar and came up with procedures and policies' to help' Family Dollar. Though Huff eventually became a self-employed dump-truck driver, he told the jury that being criminally charged had “greatly” impacted him personally: I don’t really like tellin’ my business to people. I kinda try to stay private and I had to go back to the people I had sold trailers to 11Rand tell ’em what happened, and apologize ’em for bringin’ ’em into this situation ... my mother had to mortgage her house ... at the time,' I couldn’t get iny 401K out to 'even survive ... it’s been really tough .. . You find out who your friends 'are ..." I still hear the word crook, you know, watch that boy, he’s a crook ... I’m sure in every town it’s the same but you don’t hear nothin’ about the good stuff that people do. You always hear the bad that people do, you know. And in a small town of five thousand people, I mean especially trying to survive in the truckin’ business where ;sometimes you need the people ... you get that feeling, yeah, I’m still bein’ talked about and this is gonna, hurt me from now,on, you know. And that bothered me. Huffs wife “went through a hard' time,” and he “drank quite a bit for a while.” Mrs. Huff said that it was “awful” after her husband was arrested, that he grew distant, and that his blood pressure increased. She did not file a loss-of-consortium claim. No one sought and received psychological counseling or any other treatment from a medical-care provider as far as the record reveals. The circuit court instructed the jury on these two types of damages related to the malicious-prosecution claims: (1) mental anguish and (2) reasonable expenses for defense of their' criminal prosecution. Damages for mental anguish are recoverable for malicious-prosecution claims. See Yam’s Inc. v. Moore, 319 Ark. 111, 117, 890 S.W.2d 246, 249 (1994). The amount of damages associated with mental anguish, and other elements of damage, is usually a jury • question; and we do not typically substitute our judgment for the jury’s-. See Wal-Mart Stores, Inc. v. Tucker, 353 Ark. 730, 742, 120 S.W.3d 61, 68 (2003). Remittitur is an exception to the usual deference given to a jury’s verdict, however, and Family Dollar has asked that we significantly reduce the judgment amount if hot reverse it outright. A remittitur is appropriate when a jury returns a conscience-shocking verdict, or |1fione that resulted from passion or prejudice. Advocat, Inc. v. Sauer, 353 Ark. 29, 43, 111 S.W.3d 346, 353 (2003); Ark. Code Ann. § 16-64-123 (Repl. 2009). When a remit-titur is considered, the question to be answered is whether substantial evidence supports the jury’s award. Id. The answer to this question turns on each case’s facts. Wal-Mart Stores, Inc. v. Tucker, 353 Ark. 730, 742, 120 S.W.3d 61, 69 (2003) (deciding if a remittitur was proper on a cáse-by-case basis and- reviewing the proof and all reasonable inferences in a light most favorable to the appellee). On appeal, when determining whether the amount was so great as to shock our judicial conscience, we may consider past and future medical expenses, permanent injury, loss of earning capacity, scars resulting in disfigurement, pain, suffering, and mental anguish. See Bill Davis Trucking, Inc. v. Pry sock, 301 Ark. 387, 784 S.W.2d 755 (1990). If we find the jury’s damages award to be excessive, a remittitur may correct the error. Avery v. Ward, 326 Ark. 829, 837, 934 S.W.2d 516, 521-22 (1996) (general verdict usually requires new trial but when an error relates' to a separable item of damages, a new trial might be avoided by a remittitur). The judgment amount should be reduced to the most liberal amount that could be approved had the jury returned a verdict for that sum in the first place, Travis Lumber Co. v. Deichman, 2009 Ark. 299, at 15, 319 S.W.3d 239, 250. The amount of compensatory damages awarded for the malicious prosecution in this case — $2.75 million — is shocking. Huff and Ward were damaged. But the related evidence was limited to testimony describing Huff and Ward as distant, upset, and embarrassed by their arrests. Neither Huff nor Ward spent a night in jail. The felony theft charges were nolle prossed by the prosecutor — though I wholly grant that no one benefits from a felony charge | ^hanging around his neck, like an albatross, even if the charge is not fully pressed. The most physically tangible manifestation of the stress Huff and Ward experienced seemed to be a loss of sleep and Huff s increased use of alcohol. (But for how long Huff increased his drinking, by how much, and at what financial, personal; or familial ■ cost is guesswork.) Huffs wife testified that his blood pressure increased given the bad experience— but no specific, adverse medical condition or personal-discomfort link was made. We are also left groping for evidence about what specific economic harm was done by the malicious prosecution for the same reason: no testimony (expert or otherwise) addressed the lost earnings, or the lost-earning potential, of Huff or Ward. The record is completely silent as To Ward’s earnings. The only out-of-pocket expenses were that Huff and Ward incurred attorney’s fees for having to defend the criminal charges ($5,000); and Huff received up to $20,000 in loans from his mother and a friend. “A damages award is not a lottery ticket!)]” Vaccaro Lumber v. Fesperman, 100 Ark. App. 267, 267 S.W.3d 619 (2007). I would substantially reduce the judgment and bring it in line with the proof because, in my'view, Huff and Ward hit the lottery. Whiteaker, J., agrees.