

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–15–380

| | |
|---|---|
| DEREK SCOTT HAGAR, ADMINISTRATOR OF THE ESTATE OF DARREN SCOTT HAGAR, DECEASED, AND ON BEHALF OF THE WRONGFUL-DEATH BENEFICIARIES OF DARREN SCOTT HAGAR | OPINION DELIVERED: MARCH 29, 2017 |
| APPELLANT | APPEAL FROM THE CRITTENDEN COUNTY CIRCUIT COURT [NO. 18CV-2010-721] |
| V. | |
| ROBERT T. SHULL, M.D. | HONORABLE PAMELA HONEYCUTT, JUDGE |
| APPELLEE | AFFIRMED |

## ROBERT J. GLADWIN, Judge

In this medical-malpractice/wrongful-death case, appellant Derek Scott Hagar, as the administrator of the estate of his late father, Darren Scott Hagar, and as representative of his father's wrongful-death beneficiaries, appeals from a jury verdict in favor of appellee, Dr. Robert Shull. For reversal, appellant argues that the circuit court erred in certain evidentiary rulings, in restricting his cross-examination of Dr. Shull, and in instructing the jury. We affirm.

### I. *Background*

Darren Scott Hagar (Scott) died on January 15, 2010, at age forty-two. He suffered from morbid obesity, severe obstructive sleep apnea, and a host of other medical problems and had been treated for many years by his primary-care physician, Dr. Trent Pierce. In

SLIP OPINION

December 2009, Scott visited Dr. Pierce for a checkup and underwent a chest x-ray. The results were unremarkable.

Less than a month later, on Wednesday, January 13, 2010, Scott presented to Dr. Pierce with flu-like symptoms. Dr. Pierce prescribed Tamiflu, cough medicine, Cipro (an antibiotic), and the pain medicine Darvocet. Scott's condition improved somewhat, but he was still coughing and began to experience pain on his right side. According to his wife, he had also coughed up blood. At approximately 4:00 a.m. on Friday, January 15, 2010, Scott's mother drove him to the Crittenden County Hospital emergency room.

Upon arriving at the ER, Scott complained of severe abdominal pain and coughing with recent flu. The triage nurse noted, among other things, that Scott was alert and oriented; that his breathing was not labored; and that his temperature and blood pressure were normal. However, Scott also registered a below-normal pulse-oximeter reading and elevated respiration and pulse rates.

Scott was next seen by Registered Nurse Geraldine Massey, who recorded that he had pain in his right ribs and a cough that produced blood (which she did not personally witness). Shortly thereafter, Scott was examined by the ER physician on call, appellee Dr. Robert Shull. Dr. Shull noted that Scott complained of a cough; of chest and abdominal pain worsened by a deep breath; and of being dissatisfied with the Darvocet that Dr. Pierce had prescribed for pain. The doctor also listened to Scott's breathing and detected a sound called "rhonchi," which was consistent with bronchitis, but did not detect a "rales" sound, which would have been consistent with pneumonia. Knowing that Scott was already being treated with an antibiotic, Dr. Shull diagnosed him with muscle strain from coughing and

prescribed a more potent painkiller, Lortab. Scott's mother insisted on a chest x-ray, which was taken within a short time and transmitted electronically to the hospital's computer system.

According to Dr. Shull, he viewed the x-ray on the ER's computer terminal and determined that Scott had atelectasis—a collapse of small airways in the lungs that is common in larger patients—but not pneumonia. The doctor conveyed that information to Nurse Massey, who told Scott that the x-ray was fine and that he could leave. Scott was discharged at approximately 6:00 a.m., after which he dropped his Lortab prescription off at the drug store and returned home.

Later that morning, hospital radiologist Dr. Mark Mills read Scott's chest x-ray. Dr. Mills observed an "enlarged" cardiac silhouette and evidence "suggesting pneumonia or atelectasis." He did not contact Scott's family or Dr. Shull, who had gone off duty.

Meanwhile, Scott's family tried to telephone him throughout the day but could not reach him. Late that afternoon, Scott's mother went to his house and saw him through a window, sitting motionless. She called 911, and paramedics transported Scott back to Crittenden County Regional Hospital between 6:00 p.m. and 7:00 p.m. There, Scott was pronounced dead by Dr. Shull, who had just come back on duty.

Concerned that he had missed something, Dr. Shull reviewed Scott's chest x-ray and read the radiologist's report. Upon doing so, he was satisfied that his diagnosis was correct and that Scott would not have benefited from being admitted to the hospital.

A few days later, an autopsy was performed by Associate Medical Examiner, Dr. Daniel Dye. Dr. Dye concluded that Scott died of cardiomyopathy (heart enlargement) due

to obesity, with acute bronchopneumonia. The doctor also performed a toxicology analysis, which revealed that small amounts of several medications were present in Scott's system, including acetaminophen; dextromethorphan (cough suppressant); Darvocet; hydrocodone (Lortab); oxycodone (Percocet); and promethazine (Phenergan). Dr. Dye stated that these drugs "were all in the therapeutic or subtherapeutic range and were all administered (prescribed) by a physician" and did not directly contribute to Scott's death.

On December 14, 2010, Scott's family sued Dr. Shull and Crittenden County Hospital for medical negligence and wrongful death. The complaint alleged that Dr. Shull failed to properly assess, examine, and diagnose Scott during the emergency-room visit and should have admitted him to the hospital for treatment of pneumonia. The hospital and its insurers settled for $400,000 and were dismissed with prejudice. The case then went to trial against Dr. Shull.

At trial, appellant's medical expert, Dr. Henry Smoak, testified that Dr. Shull breached the standard of care when he failed to admit Scott to the hospital for treatment of pneumonia. Dr. Smoak based his opinion on Scott's presentation in the ER; his medical history; and a comparison between the "abnormal" chest x-ray taken on the morning of January 15, 2010, and the unremarkable x-ray taken a few weeks earlier in December 2009. For the defense, Dr. Darren Flamik testified that the standard of care would not have required Dr. Shull to admit Scott to the hospital. Dr. Flamik further testified that Scott's death was not due to pneumonia but to his enlarged heart and other medical problems, plus the "mixed drug intoxication" from the many medications in his system. Other defense

experts agreed with Dr. Flamik's testimony. Following a lengthy trial, the jury returned a unanimous verdict in favor of Dr. Shull.

## II. *Cross-Examination and Impeachment of Dr. Shull*

Appellant argues first that the circuit court erred in excluding certain impeachment evidence and in restricting his cross-examination of Dr. Shull. Our standards of review are well established. We will not reverse a circuit court's exclusion of evidence absent a manifest abuse of discretion. *Poff v. Elkins*, 2014 Ark. App. 663, 449 S.W.3d 315. Also, the scope and extent of cross-examination lie within the circuit court's discretion. *Herrington v. Ford Motor Co., Inc.*, 2010 Ark. App. 407, 376 S.W.3d 476. We will not reverse the decision to limit cross-examination absent a clear abuse of that discretion. *Bd. of Comm'rs of Little Rock Mun. Water Works v. Rollins*, 57 Ark. App. 241, 945 S.W.2d 384 (1997).

Appellant's arguments involve the two chest x-rays performed on Scott near the time of his death: the January 15, 2010 x-ray taken the morning that he visited the ER; and the December 2009 x-ray taken during his check up with Dr. Pierce.

### A. The January 15, 2010 X-Ray

Dr. Shull testified that, before he discharged Scott from the ER on January 15, 2010, he looked at the chest x-ray that had been taken just minutes earlier and concluded that Scott did not have pneumonia. Nurse Massey corroborated the doctor's testimony that he viewed the x-ray. Appellant's own expert, Dr. Henry Smoak, also testified that he believed that Dr. Shull had viewed the x-ray. Nevertheless, appellant proffered the testimony of the hospital's IT specialist, Shawn Dowdy, in an effort to show that Dr. Shull had *not* looked at

the x-ray before releasing Scott from the hospital. The circuit court refused to admit Dowdy's testimony. We affirm the court's ruling.

The proffer shows that Dowdy would have testified that the hospital's IT system generates a user log for the emergency-room computer. According to Dowdy, Dr. Shull's name did not appear on the user log as viewing Scott's x-ray on the morning of January 15, 2010; rather, the log showed that the account of a nurse practitioner, Janet Pearson, was used to access Scott's x-ray. Still, Dowdy stated that the log "doesn't actually tell us who looked at the x-ray." He explained that if Ms. Pearson left her shift without logging off the computer, anyone who sat down at the computer could open an x-ray, and the record would show Pearson as the user. He also said that he had heard of doctors using other practitioners' accounts to view the computer.[1] Dowdy stated that if Dr. Shull testified that he looked at Scott's x-ray on the morning of January 15, he would have no reason to disagree with him.

An appellant has the burden of demonstrating reversible error. *Watkins v. Paragould Light & Water Comm'n*, 2016 Ark. App. 432, 504 S.W.3d 606. Here, it is questionable whether Dowdy's proffered testimony and user log significantly contradicted Dr. Shull's statement that he viewed the x-ray on the morning of January 15. Dowdy said that the log "doesn't actually tell us who looked at the x-ray," and he expressed no disagreement with Dr. Shull's claim that he had looked at the x-ray on the morning of January 15. Consequently, we are not persuaded that the circuit court abused its discretion in excluding

---

[1]Dr. Shull later testified that the hospital's computer system was problematic and that "if it's up and working and somebody is signed in, we just keep using it."

SLIP OPINION

Dowdy's testimony or that reversible error has been shown. *See generally Keene v. State*, 56 Ark. App. 42, 938 S.W.2d 859 (1997) (affirming a trial court's decision to exclude evidence where we were not persuaded that the evidence contradicted a witness's testimony).

### B. The December 2009 X-Ray

During cross-examination, Dr. Shull testified that he had not seen Scott's December 2009 x-ray prior to trial. He also testified that, on the night that Scott returned to the hospital and was pronounced dead, he reviewed Scott's records one time to check his diagnosis. Appellant argues that the circuit court erred in excluding evidence that would have impeached these statements.

Appellant initially suggests that the circuit court improperly excluded testimony from Shawn Dowdy on these points. However, that is not the case. Although some of Dowdy's testimony was merely proffered, as discussed above, other parts of his testimony were given in the presence of the jury. Regarding the issue at hand, Dowdy told the jury that the hospital's computer system allowed a doctor to pull up a patient's previous x-ray along with a current x-ray. He also testified that, after Scott was brought back to the hospital on the evening of January 15, 2010, someone logged onto the hospital's computer "a number of times" to view what could have been two different x-rays, and possibly a previous x-ray history. Further, while the computer log recorded the user that night as a Dr. Paul Veach, Dr. Shull later testified that he was the user and that Dr. Veach had already left the hospital.

In our view, the above testimony provided ample opportunity for appellant to impeach Dr. Shull's statements regarding the 2009 x-ray and his actions on the night of January 15. In fact, appellant referred to Dowdy's testimony and to the computer logs during

closing argument in an effort to show that Dr. Shull had been untruthful regarding these matters. Error may not be predicated on an evidentiary ruling unless a substantial right is affected and the appellant is prejudiced by the ruling. *Howard v. Adams*, 2016 Ark. App. 222, 490 S.W.3d 678.

Appellant argues further that the circuit court improperly restricted his cross-examination of Dr. Shull. During the doctor's trial testimony, appellant's counsel asked to "pull up" the December 2009 x-ray. Dr. Shull objected that appellant was preparing to ask his opinion of the x-ray. Appellant stated that he just wanted to "establish that [Dr. Shull] had access to it" and that "it's significant to show the jury that he did not look at it." The court allowed appellant to ask Dr. Shull if he had looked at the 2009 x-ray. As mentioned, Dr. Shull responded that he had not seen the x-ray until the trial.

We cannot say that reversal is warranted on this point. Appellant wanted to establish that Dr. Shull did not look at the 2009 x-ray. Dr. Shull testified that, in fact, he had not. Appellant also wanted to establish that Dr. Shull had access to the 2009 x-ray. This was accomplished through Shawn Dowdy's testimony that the hospital's computer system allowed the user to pull up a patient's previous x-ray along with a current x-ray. Appellant therefore met his stated objectives.

Later in the trial, appellant argued that he also wanted Dr. Shull to compare the 2009 x-ray with the 2010 x-ray and testify whether he agreed that Scott's cause of death was pneumonia. However, Dr. Shull had his own expert witnesses for those purposes. In short,



appellant has not convinced us that any of the court's limitations on Dr. Shull's testimony were unduly restrictive or merit a new trial.

### III. *Evidence of the Source of Medications*

Appellant argues next that the circuit court erroneously admitted evidence that some of the drugs found in Scott's system were not prescribed to him. We review the court's ruling for an abuse of discretion. *Poff, supra.*

Before trial, appellant filed a motion in limine to exclude evidence regarding the source of the medications that were found in Scott's system. The court denied the motion. As a result, a police report was admitted into evidence stating that Scott had taken some of his wife's Lortab medication. Also, Scott's wife testified that she had a prescription for Phenergan and for oxycodone (Percocet), both of which were found in Scott's system. Additionally, Dr. Shull's expert, Dr. Flamik, testified that he could not find in Scott's pharmacy records that Scott had a prescription for Phenergan or Percocet.

Appellant argues that the source of the medicines in Scott's system was irrelevant and allowed Scott to be portrayed as "drug seeking." However, this proof was relevant to Dr. Shull's defense of comparative fault. Our comparative-fault statute provides that, for all actions for damages for personal injuries or wrongful death or injuries to property in which recovery is predicated on fault, liability shall be determined by comparing the fault chargeable to a claiming party with the fault chargeable to the party from whom recovery is sought. *See* Ark. Code Ann. § 16-64-122(a) (Repl. 2005). The word "fault" includes any act, omission, conduct, risk assumed, breach of warranty, or breach of any legal duty which is a proximate cause of any damages sustained by any party. Ark. Code Ann. § 16-64-122(c).

SLIP OPINION

In this case, Dr. Shull's experts attributed Scott's death in part to the ingestion of several drugs that, when acting together, were toxic and suppressive to respiratory drive. Dr. Brent Staggs in particular testified that taking multiple, similar medicines can be dangerous, especially if "they're not prescribed to you." In light of this evidence, Dr. Shull's reliance on the defense of comparative fault made the source of the medications relevant.

### IV. *Verdict Interrogatory*

The jury was given the following verdict interrogatory: "Do you find from a preponderance of the evidence that Dr. Robert Shull committed medical negligence that proximately caused the injuries and death of Darren Scott Hagar?" The jury unanimously answered no. Appellant argues that the circuit court should have divided this interrogatory into two distinct interrogatories that "separated Dr. Shull's negligence from the wrongful death claim." We review the court's choice of jury instructions for an abuse of discretion. *See Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003).

A wrongful-death cause of action arises when a person's death is caused by neglect such as would have entitled the party injured to maintain an action in respect thereof if death had not ensued. Ark. Code Ann. § 16-62-102(a)(1) (Supp. 2015); *Brown v. Pine Bluff Nursing Home*, 359 Ark. 471, 199 S.W.3d 45 (2004). A wrongful-death action is therefore derivative of the original tort. *See Brown, supra*. That being so, the court in this case was not bound to provide separate verdict interrogatories for appellant's claims of negligence and wrongful death. Moreover, appellant has not sufficiently explained his argument that this single verdict interrogatory hampered him with regard to Dr. Shull's defense of comparative

fault. As we stated earlier in this opinion, appellant has the burden of demonstrating reversible error. *Watkins*, *supra*.

Appellant additionally cites *Advocat*, *supra*, for the proposition that a trial court may utilize several verdict forms for various related causes of action. However, the question in *Advocat* was whether the forms permitted a duplicate recovery for the same injury, which was not at issue here. In any event, *Advocat* does not require a trial court to give separate verdict interrogatories for negligence and wrongful-death causes of action.

Affirmed.

HARRISON and MURPHY, JJ., agree.

*Appellate Solutions, PLLC*, d/b/a/ *Riordan Law Firm*, by: *Deborah Truby Riordan*; and *Trammell Piazza Law Firm, PLLC*, by: *Melody H. Piazza* and *M. Chad Trammell*, for appellant.

*Wright, Lindsey & Jennings LLP*, by: *David P. Glover, Gary D. Marts, Jr.*, and *Carson Tucker*, for appellees.